Victor M. STERN, Appellant,

v.

STATE of Alaska, Appellee.

No. A–3405.

Court of Appeals of Alaska.

Feb. 14, 1992.

Margi Mock, Asst. Public Defender and John B. Salemi, Public Defender, Anchorage, for appellant.

Nancy R. Simel, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

## OPINION

MANNHEIMER, Judge.

Victor M. Stern was convicted of murder in the first degree, AS 11.41.100(a)(1), following a jury trial in the superior court at Fairbanks. He was sentenced to 99 years' imprisonment with no possibility of parole. Stern appeals his conviction, asserting first that the grand jury indictment returned against him was vitiated by improper evidence, and second that the trial judge abused his discretion when he authorized Stern's shackling during the trial. Stern also appeals his sentence, challenging the judge's decision to deny Stern the possibility of parole release. We affirm.

In the early morning of December 26, 1988, Victor Stern was drinking with friends at the house of Leon English. At some time during the previous evening or earlier that morning, Stern had borrowed English's car to pick up a friend from the hospital. When Stern returned to English's house, he had a gun in a holster; the gun appeared to be an automatic.

Around 6:00 a.m. that morning, English was driving Stern and some other friends home in his yellow Cadillac. Stern asked English to stop at the Carrs grocery store at the intersection of Northern Lights and Muldoon. Stern and another man named LeNeal Waters left the car and entered the store. After a time, Waters decided they had been in the store long enough. In an attempt to get Stern out of the store, and thinking that Stern might not have enough money, Waters picked up some cartons of cigarettes and offered to pay for them. Stern did not respond to this offer; instead, he left the store. Waters put the cigarettes down and followed Sterns.

As Waters returned to the car, Bryan Roten, the produce manager at Carrs, approached Stern: another Carrs' clerk had seen Waters and had thought he was attempting to shoplift the cigarettes. Stern allowed Roten to write down the license plate number of English's Cadillac for future reference. The encounter was low-key, without any insults or physical confrontation.

English then drove Stern and Jackie Robinson, Stern's sister, to their mother's house. But after Jackie and Stern's other sister had changed for bed, they noticed that Stern was missing. Stern had left the house and returned to Carrs.

Between 7:45 and 8:00 a.m., Gene Courtney, an employee at the Muldoon Carrs, was working in the parking lot when he saw a man walk through the lot and enter the store. The man wore dark clothes and a hat or ski mask.

Sterling Bouma, another Carrs' employee, was in the produce aisle when he saw Bryan Roten on his knees with a man standing over him; Roten's arms were outstretched. Bouma heard a shot and then saw the man run away. Blood started coming from Roten's head; Bouma saw a gun in the fleeing assailant's hands. Lesley Scott, who was standing at the courtesy booth in Carrs, also heard the shot and saw the man. Scott described the assailant as being 5'8" tall, with an average build, and dressed in black pants, a dark brown coat and a black knit cap.

Bouma, with Scott's help, called 911. Meanwhile, two Carrs employees chased the assailant as he left the store; they lost track of him near Glencaren Trailer Park. One of the employees, Kurt Solberg, described the assailant as a dark-complexioned man in his early twenties, about 150 pounds, hair just a couple of inches high and wearing dark-colored clothing. Solberg returned to Carrs and showed police officers two different sets of footprints near the trailer park where they had lost the assailant.

Two Anchorage police officers, Officer Shore and Officer Butcher (a "K–9" or dog-handler officer), went to the trailer park and began tracking the assailant with the assistance of a dog. Because of the weath-

er conditions, the dog had difficulty tracking the scent. Officer Shore returned to where the Carrs employees had lost the assailant. He identified a set of tracks indicative of a running person, consistent with the description given by the Carrs employees. Officer Shore then located Officer Butcher and they began tracking the footprints by sight.

The officers had lost the trail in the vicinity of trailer park space 373, when a woman living in space 375, Debbie Miller, stepped out of her trailer onto her porch. Miller was agitated; a little earlier that morning, she had been awakened by someone beating on her door. It was Stern.

Stern had come in and sat on Miller's couch. He appeared out of breath. When Stern dropped his coat to the floor, it made a "thump" as if it contained something heavy. As they spoke, Stern started gagging; he went to Miller's kitchen sink and threw up. Stern then sat back down, stripped off his clothing except for his pants and shoes (both of which were black), and told Miller to go wake her boyfriend, Robert Waychoff.

Miller woke Waychoff; Waychoff took Stern to the bedroom, where they talked. Stern told Waychoff that he had been the "eye" (that is, the lookout) for a "hit man". Waychoff lent Stern his cap and a rust-colored coat. He then drove Stern home.

Miller consented to have the officers search her trailer. Inside Miller's residence the police discovered a black baseball cap, black knit gloves, a ski mask, a dark blue sweatshirt, and a black tank top, all wrapped in a white sheet. Miller then showed the police where Stern lived.

In the meantime, Stern had arrived at his residence. Shortly before he returned, some of his family members had seen a television news report about the shooting. They mentioned the shooting to Stern, and one or more of them told Stern that the victim was still alive. Stern met this news with the question, "[H]e's still alive? You mean he didn't die[?]" Stern then changed his clothing again.

The Anchorage police obtained a search warrant for Stern's house. When the police arrived to execute this warrant, they asked everyone to come out. Before the family members left the house, Stern's sister, Jacqueline Robinson, saw Stern wrap up a dark, black object—which she assumed to be a gun—and hide it above the closet ceiling of the northeast bedroom, in a hole leading to the attic.

During their search of the house, the police found a pair of black leather shoes whose soles had patterns similar to the pattern found in the footprints outside of trailer space 375. The police also found a maroon jacket, a black and white hat, and a pair of black pants.

When the police searched the attic, they found a semi-automatic Glock pistol containing four live rounds, wrapped up in a multi-colored cloth. Forensic firearms specialist Robert Shem examined the Glock pistol and its live rounds; he determined that the bullet recovered from Bryan Roten's body had been fired from this pistol.

After Stern was indicted for murder in the first degree, he moved to dismiss this charge, asserting that improper evidence had been admitted at grand jury. Superior Court Judge Mark C. Rowland agreed with Stern that certain evidence had been improperly admitted at grand jury, including testimony about a "gun fight" on the night before the shooting, as well as other evidence suggesting Stern's character for violence and the fact that he had recently been released from prison. However, Judge Rowland denied Stern's motion to dismiss the indictment, concluding that this improper evidence had not appreciably affected the grand jury's decision to indict Stern.

■ Stern's first argument on appeal is that Judge Rowland used the wrong test to determine whether admission of this evidence called for dismissal of the indictment. As Stern correctly notes, when a defendant proves that the grand jury heard improper evidence, the superior court must engage in a two-part analysis. The superior court first subtracts the improper evidence from the total case heard by the grand jury and determines whether the re-

maining evidence would be legally sufficient to support the indictment. If the remaining evidence is legally sufficient, the court then assesses the degree to which the improper evidence might have unfairly prejudiced the grand jury's consideration of the case. The question the court must ask itself is whether, even though the remaining admissible evidence is legally sufficient to support an indictment, the probative force of that admissible evidence was so weak and the unfair prejudice engendered by the improper evidence was so strong that it appears likely that the improper evidence was the decisive factor in the grand jury's decision to indict. *Oxereok v. State*, 611 P.2d 913, 916 (Alaska 1980); *Panther v. State*, 780 P.2d 386, 393–94 (Alaska App.1989); *Newman v. State*, 655 P.2d 1302, 1306 (Alaska App.1982).

■ Despite Stern's assertions on appeal, the record demonstrates that Judge Rowland understood that his task was to determine not only whether the remaining evidence would support an indictment but also whether the improper evidence "appreciably affected" the grand jury's verdict— whether there was a reasonable probability that the grand jury's decision would have been different if it had not heard the improper evidence. *Love v. State*, 457 P.2d 622, 631 n. 15 (Alaska 1969). The following exchange occurred during the argument on Stern's motion:

THE COURT: It appears to me that the "subtraction" test logically is the test to be used in determining [the] sufficiency [of the evidence]. But where prejudicial evidence is presented, it appears to me [that] it's not logical to determine the question of prejudice based on a "subtraction" test. Obviously, if that's [the only test], you [the prosecutor] can put in anything you want, right? Who cares? You can put in any prejudicial [evidence] you want ... if you apply a straight subtraction test. Wouldn't that be the result?

THE PROSECUTOR: Well, I think it would be rather clear from reading grand jury transcripts whether or not a prosecutor would do anything [wrong] intentionally....

THE COURT: Oh? Does it make sense to you, the subtraction test? It doesn't seem to me to be ...

THE PROSECUTOR: Until the court sees bad faith or something improper on the part of a prosecutor.

THE COURT: Well, if [our goal] were punishing prosecutors ..., but there's another aspect, which is whether or not the defendant got a fair grand jury proceeding ... my point being that it doesn't seem to me logical to apply [merely] a subtraction test to determine whether or not prejudice was such that the grand jury should consider the case again.

The judge and the prosecuting attorney then agreed that the correct test was the "appreciably affected" test.

Stern recognizes that this is the correct test, but he asserts that Judge Rowland was simply "paying lip service" to this test when he denied Stern's motion to dismiss the indictment. Stern points out that, during the ensuing discussion between the court and defense counsel about the meaning of "appreciably affected", Judge Rowland said that he construed that phrase as requiring the court to ask the question, "if the grand jury hadn't heard the [improper] evidence, would they have returned a true bill?"

Stern interprets the judge's statement as a surreptitious or confused application of the subtraction test. But, even viewed in isolation, Judge Rowland's comment was merely ambiguous. When Judge Rowland's statement is interpreted in the context of the entire discussion, it is clear that Judge Rowland understood the additional analysis required after the improper evidence had been subtracted from the evidentiary total.

Stern also contends that, even if Judge Rowland applied the correct test, he reached the wrong conclusion. Stern argues that the grand jurors must have been affected after hearing evidence of his violent past actions and evidence that he had served time in prison. Stern concedes that

the case against him was strong, but he argues that the strength of the case was undercut because the evidence of Stern's guilt was only "circumstantial".

▇▇▇ However, Alaska law does not distinguish between a case built on direct evidence and one built on circumstantial evidence. *Des Jardins v. State*, 551 P.2d 181, 184–85 (Alaska 1976). Judge Rowland reviewed the grand jury record, applied the correct legal test, and found that the improper evidence had not appreciably affected the grand jury's decision to indict Stern. His decision must be affirmed unless it constituted an abuse of discretion. *Stevens v. State*, 748 P.2d 771, 774 (Alaska App.1988). Stern has not shown that Judge Rowland abused his discretion when he denied Stern's motion to dismiss the indictment.

Stern's second argument on appeal challenges the trial court's decision authorizing the State Troopers to put Stern in leg shackles during the trial.

Two weeks before the trial commenced, the prosecutor presented the court with a request from the Judicial Services branch of the State Troopers that Stern be shackled as a security measure. Arguing that Stern was a particularly dangerous and unpredictable individual, the prosecutor presented Stern's prior criminal record as well as the facts of the present case. The prosecutor also asserted that Stern had a hatred of white people in general, a hatred manifested by letters found at the jail in which Stern spoke of the religious duty of eliminating the white race. The prosecutor reported that there had been trouble at the jail when white guards came near Stern or attempted to touch him. The prosecutor also presented the court with a copy of a letter Stern had sent to the Anchorage Police Department; in this letter, Stern expressed happiness that a police officer had recently been killed, and he declared that there would be more officers killed, "all in the name of God and … settling accounts".

In addition to the prosecutor's argument, a Judicial Services officer told the court that Stern had three prior assault convictions, two misdemeanors and one felony. (The officer was mistaken: Stern's three prior assault convictions comprised two felonies and one misdemeanor.)

Stern's attorney conceded that Stern felt a certain religious animosity toward white people, but she asked the court to "take judicial notice that both Mr. Howard [Stern's other defense attorney] and I are white, and we've had no problems with [him]." Stern's attorney also pointed out that there had been no allegation that Stern had ever tried to escape. She pointed out that many defendants charged with serious or even heinous crimes had been brought to trial without shackles or other restraints, and she argued that courts should order shackling of a defendant only when he or she posed an escape risk.

Judge Rowland took the matter under advisement, asking the prosecutor to submit copies of all the letters and jail records to which he had referred.

Ten days later on October 2, 1989, when the parties appeared in court just before trial, they found that skirting had been affixed to the prosecution and defense tables. The defendant's table was skirted so that the jury could not see Stern's legs; the prosecutor's table was skirted as well, so that the jury's attention would not be drawn to the skirting around the defense table.

Stern's attorney objected, pointing out that the court had never ruled on the prosecution's motion to shackle Stern:

DEFENSE ATTORNEY: Mr. Stern is not shackled right now. He's not presently shackled. And I don't see any reason to have the skirting if he's not shackled.

THE COURT: Well, the only reason to—I [would] agree with you, if that were going to be the case. But that's not going to be the case. I've reviewed the materials which were submitted by [the prosecutor]. I've listened to the representations made here in open court by the security people. The reason Mr. Stern is not shackled this morning is because we have available to us four

security people in this courtroom this morning. There are two on the right and two on the left. That's not possible every day.... [When this is not possible], Mr. Stern will be shackled based upon his conduct.

The defense attorney objected to this ruling. He conceded that Stern's letters contained violent rhetoric, but he argued that Stern's actual conduct had been unexceptional. The following colloquy ensued:

THE COURT: Well, ... since our last hearing, ... it's also come to my attention that Mr. Stern has made representations to the [Judicial Services] officers about how many people it was going to take [1], and one thing or another. We can go into that at this time, if you want.

DEFENSE ATTORNEY: No, that's fine, Your Honor. Well, in light of that, then, my next objection is to [the] placement of these [security] officers. We have four officers, and I object to that, for the record. Secondly, I object to the location of these two officers who are in plain clothes.... The two [who are against] the wall to the far right, behind the jury box—for the record—are in their uniform. But we're not fooling anybody by—these people are basically breathing down our backs, and if you're going to have—I object to them in the first place, [but] if you're going to have them, I'd ask that they be sitting somewhere in the rows [farther] back.

It appears that Stern did not wear shackles during the next two days of court proceedings. But as the court prepared to recess on October 5, Stern's attorney again complained about the skirting at the parties' tables and asked if the presence of the skirting indicated that the court had decided to shackle Stern. Judge Rowland replied that, although several Judicial Services officers were present in the courtroom that day, the number of available officers was about to decrease because of other court proceedings. Since only two officers were guaranteed available to guard the

courtroom during the coming days of trial, Judge Rowland ordered leg restraints.

A criminal defendant has a right to appear in front of his or her jury without the badges of custody. This rule is intended to insure that the jury is not prompted to relax the presumption of innocence on account of the defendant's status as a prisoner. *Anthony v. State,* 521 P.2d 486, 496 (Alaska 1974); *Newcomb v. State,* 800 P.2d 935, 942 (Alaska App.1990); *Contreras v. State,* 767 P.2d 1169, 1172 (Alaska App. 1989).

However, this right is not absolute. A judge may order the defendant physically restrained if the judge is convinced that this action is reasonably necessary either to forestall the defendant's escape, to protect the safety of participants and spectators, or to insure the orderly process of the court. *Contreras,* 767 P.2d at 1172; *W. LaFave & J. Israel, Criminal Procedure* (1984), § 23.2, Vol. 3, pp. 10–11; ABA Standards for Criminal Justice (2nd ed. 1980), Standard 15–3.1(c) and accompanying commentary. A trial judge's decision to order the defendant physically restrained is not to be overturned unless the decision is shown to be an abuse of discretion. *Contreras,* 767 P.2d at 1172.

On appeal, Stern argues that Judge Rowland abused his discretion by abdicating his decision-making role and simply acquiescing in the Judicial Services request for mere "administrative convenience". The record does not support this claim. Judge Rowland heard argument on this issue and, following that argument, he ordered the prosecution to supply written materials to back up its assertions that Stern was violent and unpredictable. Even when, on the basis of those materials, Judge Rowland was persuaded that extra security measures were required, he preferred the option of having additional Judicial Services officers in the courtroom; he turned to the alternative of shackles only

---

**1.** When Stern was returned to jail from his court appearance on September 29, 1989, he told the Judicial Services officers, "You guys think you're really tough, [but] it'll take more than the two of you."

when those extra officers became unavailable.

 Stern additionally argues that, even if Judge Rowland did make an independent decision, he made the wrong one. Stern asserts that the record fails to show any substantial reason for restraining him. He contends that, apart from his prior assault convictions, there was no basis for Judge Rowland's decision to require shackles other than "raw and unfounded speculation that security personnel and courtroom spectators might be at risk if Mr. Stern attempted to escape."

But Stern's argument ignores the materials submitted by the prosecution. These materials document Stern's statements (both oral and written) in which he advocated and anticipated the killing of police officers, both in the name of religion and to redress wrongs committed against black people, and in which he assured Judicial Services officers that it would take more than two of them to restrain him.

When Judge Rowland announced on October 5 that he had been persuaded by these materials that either extra guards or physical restraints were necessary, he offered Stern's attorneys the chance to address the details of the State's proof. Stern's attorneys declined, responding, "No, that's fine, Your Honor."

In fact, Stern's attorney's remarks (quoted in more detail above) might be taken as indicating a preference for shackling rather than having several security officers present in the courtroom. After Judge Rowland announced his decision that extra security was needed, Stern's attorney declared, "Well, in light of that, then, my next objection is to [the] placement of these [security] officers. We have four officers, and I object to that, for the record.... [W]e're not fooling anybody by—these people are basically breathing down our backs ... I object to them[.]"

On this record, Stern has not demonstrated that Judge Rowland abused his discretion when he ordered that Stern be shackled when extra Judicial Services officers could not attend the proceedings.

 Stern also argues that, even assuming Judge Rowland's decision was justified, the skirting attached to the counsel tables was inadequate to keep knowledge of Stern's shackles from the jury. He argues that the curtains initially attached to the counsel tables kept coming unattached, requiring counsel to continually prop them up, and that when brown paper skirting was brought in as a replacement for the curtains, the paper rattled. He also argues that, rather than screening Stern's shackles, the skirting actually accentuated the security measures.

The record affirms Stern's claim that the curtains originally attached to the tables tended to come unattached and for this reason were replaced with brown paper. But when defense counsel complained that the paper was rattling, Judge Rowland agreed that the curtains would be reattached if some way could be found to do it. The record contains no further reference to this matter, so it may be presumed that defense counsel's request was honored.

Moreover, whatever problems there may have been early on with the skirting, those problems were rectified before Stern actually began to wear shackles. The following discussion occurred at trial about the skirting and the problems encountered with it:

MR. STOCKLER: Your Honor, on the appellate record on that, when we were first arguing the curtain [issue], the Court talked about had they been falling down [sic], and I ... said mine's been falling down. I was referring to the day of jury selection, when [Stern] was not in leg irons. And I don't want the Court of Appeals to think that the jury saw the things falling down. Remember when we switched from ...

THE COURT: Oh no, no, no, no.

MR. STOCKLER: ... I was referring to the back of the table.

THE COURT: (to the defense attorneys) You'll agree that the jury didn't see them falling down, I'm sure.

MR. HOWARD: I don't ...

MS. EASTER: Well, they may have seen them falling down, but we'll agree

that, [on] that particular day, Mr. Stern wasn't in leg irons.

MR. STOCKLER: He wasn't in leg irons. That was when the jury was seated behind me. Mine kept falling down from behind.

THE COURT: It seems to me [that], at that point in time, the only time [the jury] would have seen Mr. Stern was in this courtroom when he wasn't in leg irons, and it was only after the jury was selected and we actually began the trial, and there have been no incidents since that time of them falling down, have there?

MR. STOCKLER: No, none, for the record.

(No response from defense counsel.)

Finally, regarding Stern's claim that the skirting called the jury's attention to his shackles rather than screening them, there is no support in the record for this assertion. Stern's attorney never suggested that the presence of the skirting itself drew attention to the shackles. Rather, he argued to Judge Rowland that the rattling of the brown paper would draw the jury's attention. Judge Rowland disagreed with this assessment, specifically finding that the brown paper skirting did not draw the jury's attention to the security measures. In any case, as indicated above, the brown paper skirting was apparently a temporary measure; Judge Rowland acquiesced in the defense request to have the curtains reinstalled. Stern does not claim that this reinstallation did not occur, nor does the record contain any further defense objection concerning this issue.

At the conclusion of the trial, the jury convicted Stern of first-degree murder. Judge Rowland sentenced Stern to 99 years' imprisonment without possibility of parole. On appeal, Stern does not challenge the 99–year term of imprisonment. He does, however, claim that Judge Rowland was clearly mistaken when he decided to exercise his authority under AS 12.55.-115 to eliminate Stern's parole eligibility.

■■■■ When a sentencing judge restricts parole eligibility, the judge must specifically address the issue of parole restriction, setting forth with particularity his or her reasons for concluding that the parole eligibility prescribed by AS 33.16.090 and AS 33.16.100(c)–(d) is insufficient to protect the public and insure the defendant's reformation. *Newell v. State*, 771 P.2d 873, 876 (Alaska App.1989), quoting *Spencer v. State*, 642 P.2d 1371, 1377 (Alaska App.1982). When the defendant's sentence is lengthy, as in Stern's case, Alaska law presumes that questions of discretionary release are better left to the Parole Board, since the Board evaluates the advisability of parole release in light of the defendant's tested response to Department of Corrections rehabilitative measures. *Lawrence v. State*, 764 P.2d 318, 321 (Alaska App.1988). However, because the Alaska legislature has affirmatively given sentencing judges the power to restrict or deny parole eligibility, this presumption (that parole release of long-term prisoners should normally be evaluated after the defendant has established an institutional history) must remain rebuttable. *Bloomstrand v. State*, 656 P.2d 584, 591 (Alaska App.1982). We conclude that Stern's case is one of the few instances in which, even though the defendant received a 99–year sentence, denial of parole eligibility was not clearly mistaken.

■■■■ Stern was twenty-six years old at the time of sentencing. His criminal history had begun eight years before. In 1982, Stern was convicted of disturbing the peace. In May 1983, he was convicted of disorderly conduct (fighting). In October of that same year, Stern was convicted of harassment for attacking a waiter at a restaurant. Two months later, in December, Stern committed fourth-degree assault, attacking his wife and breaking her nose. In 1984, Stern was again convicted of harassment, this time in connection with a trespass at Lathrop High School in Fairbanks.

In 1986, Stern committed three felonies. Using handguns that he knew had been stolen in a recent burglary, Stern walked up to two strangers and, with a gun in each hand, cocked the hammers and pointed the weapons at them. Stern had no explana-

tion for his assaults on these two people, other than to say, "I was just having some fun." For this conduct, Stern was convicted of two counts of third-degree assault and one count of second-degree theft (by receiving).

In the 1986 pre-sentence report, Stern conceded that he had a serious problem with alcohol, and he declared that he was "definitely going to quit" drinking. The pre-sentence investigator told the court:

> [Stern] is a young man who, in the last few years, has demonstrated an apparent disregard for the safety of other people. When drinking, the defendant has assaulted his wife, his friends, and, as illustrated in the present offense, total strangers. [I believe] the defendant is a serious threat to the community.

For the two assault convictions, Stern received concurrent sentences of 2½ years in jail with 21 months suspended (9 months to serve). For the theft of the handguns, he received 4 years with 3 years suspended. Stern was released on probation in August 1987.

Over the next nine months, Stern worked sporadically at different jobs. On the night of March 29, 1988, Stern drank himself into extreme intoxication and then began talking about "putting sticks of dynamite in people's mouths and watching their heads blow off". The next day, he voluntarily committed himself to the Alaska Psychiatric Institute in Anchorage, claiming he was afraid he was going to hurt someone.

Stern was initially diagnosed as having a paranoid personality disorder. However, following two weeks in the hospital during which Stern refused most treatment efforts and finally asked for his discharge, the API staff diagnosed Stern as having a personality disorder with sociopathic and borderline features. API's prognosis for future treatment was poor. The evaluating psychiatrist concluded that Stern "cannot benefit from hospitalization and frankly had little intention of interacting in any therapeutic way with anyone."

When Stern left API, the Department of Corrections petitioned the superior court to revoke his probation. Stern was held in jail for ten days and then was released on condition that he report to the Salvation Army rehabilitation program. Stern did so on May 3, 1988. Throughout May, June, and July 1988, Stern apparently made good progress in the Salvation Army program; he also started attending Alcoholics Anonymous meetings.

In July, Stern was accepted into the Southcentral Counseling Center's substance abuse treatment program. He entered the program on August 1. However, by August 8, Stern had been terminated because he failed to appear four different times. Stern then entered the Allvest drug rehabilitation program; however, he was terminated from Allvest on September 19 because he failed to appear on four different urine test dates.

At the same time, Stern was failing to make his appointments with his probation officer. The Department of Corrections petitioned to revoke his probation. On September 13, Stern showed up for a status hearing on this petition, but then he failed to make his next scheduled appearance on September 27 and a warrant was issued for his arrest.

Stern remained in jail until mid-December. In late November, his probation officer met with him at Cook Inlet Pretrial Center. Stern asked to be re-assigned to Southcentral Counseling. The probation officer also contacted the Salvation Army, who said they would be willing to take Stern back.

Stern was released from jail on December 16, 1988. Five days following his release Stern committed felony assault and first-degree sexual assault on three people renting a house from him at 6344 East 32nd Avenue in Anchorage.

These tenants owed Stern back rent. Shortly before 2:00 a.m. on December 22, Stern and two female accomplices burglarized the house. Stern approached the first tenant, kicked him in the ribs, then pointed a pistol at his head and threatened to kill him. Stern then handed the pistol to one of his accomplices, telling her to hold the gun to the tenant's head and shoot him if he

moved. Having incapacitated this first tenant, Stern cuffed a woman tenant who had wakened and come out to see what was happening. Then Stern sought out the third tenant, also a woman, and threatened her. When she protested that she could not pay the rent, Stern told her that he would come back and kill her. Stern then forced this woman to perform oral sex on him.

Stern and his female companions then left the house. As they were leaving, one of the women told the tenants that, if the rent was not paid soon, they would come back and assault them again. Stern corrected her, "No, we're going to come back and kill them."

Two days later, in the early morning of December 24, 1988, Stern entered the Carrs store at Muldoon and Northern Lights. The music in the store was turned up too loud for Stern; using profane language and threats of physical violence, he demanded that the volume be lowered. When one store employee left to turn down the music, Stern picked a fight with another employee, addressing the employee with racist epithets.

A few minutes later, someone turned the music up again and Stern began yelling and screaming. Stern was escorted from the store. When he left, he declared, "Fuck you guys. I'll be back." About an hour and a half later, Stern returned to the store with a handgun and yelled, "White war! I'm back." He pointed the gun at the first store employee he saw, demanding to know "where in hell [were] the guys that jumped [me] earlier". The employee told Stern that he had just arrived at work and did not know what Stern was talking about. Stern told him to get out of the way.

That employee went to the back of the store, warning customers and other employees. He also called the police, who arrived within a few minutes. By that time, Stern had left the store and could not be found.

Forty-eight hours later, Stern murdered Bryan Roten with a handgun he had stolen. Thus, in addition to first-degree murder,

Stern committed two other felonies: second-degree theft, AS 11.46.130(a)(2), and first-degree misconduct involving weapons, AS 11.61.200(a)(1) (felon in possession of a concealable firearm).

Stern had a blood alcohol level of approximately .19 percent at the time of the murder. He acknowledged to the presentence investigator, as he also had acknowledged in 1986, that he had a severe alcohol problem. The pre-sentence investigator concluded:

[I]t is very clear that [Stern's] behavior demonstrates a very angry, confused, and damaged individual. Witnesses and members of his family ... described a man totally out of control, and threatening to almost everyone. Mr. Stern's behavior during [the] short time [between his release from jail and the shooting of Bryan Roten] resulted in violence being inflicted upon several members of our community[.]

Judge Rowland concluded that Stern's crime was among the worst first-degree murders. He found the crime to have been premeditated and cold-blooded: Stern had gone home following his first confrontation with Roten, had armed himself, and then had returned to Carrs to shoot Roten. Judge Rowland also found the murder to have been cruel, since Stern shot his victim after watching him plead for his life.

As Judge Rowland found, Stern committed murder to exact vengeance for an imagined slight. The killing was at least partially motivated by Stern's racist hatred of white people. Judge Rowland noted that Stern's criminal record demonstrated an escalating pattern of violence, starting with his misdemeanor convictions for disorderly conduct, harassment, and assault; moving to Stern's three prior felonies (two assaults and a theft of firearms); and culminating in the series of violent felonies Stern committed during those four days in December 1988: murder, multiple assaults with firearms, and sexual assault.

Judge Rowland found Stern to be a racist, a man full of anger, a man with a severe alcohol problem, and a man with a

proclivity for assaulting people with firearms. The record supports these conclusions.

Judge Rowland found that Stern, throughout his adult life, has received treatment and other aid in support of his rehabilitation from a variety of programs, and that all of these attempts at rehabilitation have been unsuccessful. The record supports this conclusion. Judge Rowland also noted that Stern had just been released on felony probation when he murdered Bryan Roten.

Judge Rowland then summarized why he concluded that Stern should not be eligible for parole during his term of imprisonment:

> [First,] the defendant has committed the worst class of offense within the framework of our community values and notions of criminal justice, and [he] is therefore deserving of the severest sentence possible to properly reflect community condemnation and reaffirmation of community values, which [goal] cannot be achieved unless parole is restricted.

> Second, I believe the defendant is incorrigible and not amenable to presently available rehabilitative techniques. [He is] therefore extremely likely to re-offend ... [and] the parole eligibility requirements set forth by statute are insufficient to protect the public, ... insure reformation, and assure that the ... sentencing goals of reaffirmation of social norms, community condemnation, and deterrence are properly served.

As this court noted in *Bloomstrand*, 656 P.2d at 591, a finding that the defendant cannot be rehabilitated within the prescribed parole eligibility period will justify parole restriction. In Stern's case, not only had he committed one of the most heinous crimes, but this murder was the culmination of an escalating series of violent acts. Stern's assaultive tendencies are exacerbated by his racist hatred and by his seemingly uncontrollable addiction to alcohol.

Stern had already served, and was apparently unaffected by, a substantial prison sentence for two senseless assaults that he committed in 1986. Moreover, Stern has shown repeatedly that he is not amenable to probationary supervision: he has committed new crimes while on probation, has failed to abide by the probation conditions established by the Department of Corrections, and has failed to comply with the requirements of various rehabilitation programs.

In *Weitz v. State*, 794 P.2d 952 (Alaska App.1990), this court upheld a denial of parole eligibility during a defendant's 169-year term of imprisonment. Like Stern, Weitz was a clearly dangerous offender with little potential for rehabilitation. Weitz's offense, like Stern's, was premeditated murder, a crime justifying a finding of "worst offender". (A defendant can be classified as a "worst offender" based on the facts of his offense alone, or upon the defendant's criminal history, or both. *Hintz v. State*, 627 P.2d 207, 210 (Alaska 1981).)

Weitz was 28 years old when sentenced, about the same age as Stern. He had a lengthy criminal record that included four previous felonies, all property crimes. He had a history of drug and alcohol abuse. The sentencing record showed that Weitz had made minimal efforts to address these problems even though he had spent substantial time in prison and on probation.

Upon these facts, this court concluded that the superior court had not been clearly mistaken when it denied parole eligibility to Weitz during what amounted to a life sentence. *Weitz*, 794 P.2d at 957–58.

Similarly, Stern's record supports that Judge Rowland's conclusion that Stern was a clearly dangerous offender whose capacity for parole supervision had been sufficiently tested (and found wanting), and that Stern should not be paroled in the future. *See Newell v. State*, 771 P.2d 873, 878–79 (Alaska App.1989) (Singleton, J., dissenting).

Stern argues on appeal that Judge Rowland, when he restricted parole eligibility, mistakenly relied on the idea that Alaska Criminal Rule 35(b) was a procedural mechanism under which Stern might come back to court and obtain a modification of this parole restriction if he could show rehabili-

tative progress. Stern points to a statement Judge Rowland made immediately after he explained why he was denying parole eligibility:

> I recognize that restricting parole does not limit the defendant's access to the courts for Rule 35 modification of parole eligibility restrictions in the future, but [the parole restriction] insures that the court will have an opportunity ... if such application is made, to insure that all of the appropriate goals of the sentence are carried out before the defendant is released into the community again.

Stern argues that this statement shows that Judge Rowland made his sentencing decision on the mistaken assumption that he could review the sentence at a later time under Rule 35(b) and reduce the sentence if Stern could show good cause for doing so. Stern points out that rehabilitation of the offender is not a ground for sentence modification under Rule 35(b). *Bartholomew v. State*, 779 P.2d 1253 (Alaska 1989); *Fowler v. State*, 766 P.2d 588 (Alaska App.1988).

However, when Judge Rowland's statement is read in the context of his entire sentencing remarks, we do not believe it indicates that Judge Rowland was trying to maintain continuing supervision over Stern's sentence. Just before he made the statement at issue, Judge Rowland declared that he believed Stern to be "incorrigible" and "not amenable to presently available rehabilitative techniques". It would seem incongruous for Judge Rowland to find that Stern had no rehabilitative potential and then make specific provision for Stern to return to court to demonstrate his rehabilitative progress.

We believe, rather, that Judge Rowland's statement indicates that his intention in denying parole eligibility was to insure that, in the event Stern ever attempted to gain his liberty by asserting rehabilitative progress, his arguments would have to be made to the superior court, not to the Parole Board. Judge Rowland did not manifest an intent to rely on Rule 35(b) as a mechanism for tempering Stern's sentence at a future time. Rather, operating under an erroneous assumption about the scope of relief available under Rule 35(b), Judge Rowland declared that, even if denying parole eligibility would not stop Stern from trying to secure his release by arguing rehabilitative progress, at least the parole restriction would insure that the governmental body evaluating Stern's claim would be the court which had heard all the evidence at trial and which had fully reviewed Stern's background.

For these reasons, the judgement of the superior court is AFFIRMED.