Lance D. HINSON, Appellant,

v.

STATE of Alaska, Appellee.

No. A–9725.

Court of Appeals of Alaska.

Nov. 28, 2008.

Marjorie Allard, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant.

Diane L. Wendlandt, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

STEWART, Judge.

A jury convicted Lance D. Hinson of extreme-indifference second-degree murder[1] for strangling Tina Shangin. The superior court imposed a net 70–year term to serve

1. AS 11.41.110(a)(2).

and restricted Hinson's eligibility for discretionary parole until he served 40 years' imprisonment.

Hinson appeals, arguing that the superior court wrongly denied his motion for judgment of acquittal. We reject this argument because reasonable jurors could find that the State proved the charge beyond a reasonable doubt.

Hinson also contends that his sentence is excessive. We affirm Hinson's 70–year term because the sentence is not clearly mistaken. However, we vacate the 40–year parole restriction imposed by the superior court because the court's sentencing findings do not justify the restriction. We also vacate a challenged probation condition because the record and the court's sentencing comments do not show that the condition is reasonably related to Hinson's rehabilitation or the protection of the public.

### Facts and proceedings

On August 6, 2000, three men found a decomposing body in a wooded area near the intersection of Bragaw Street and the Glenn Highway. When the police responded, they found Shangin's body, naked and face up, with her legs spread. Shangin was fifty-nine years old and frequented the area where her body was found. Hinson was one of the last people seen with Shangin before she disappeared.

Chief Medical Examiner Frank G. Fallico testified that Shangin died of asphyxiation due to neck compression. Dr. Fallico testified that the condition of Shangin's body was consistent with a body that had been deceased and lying in the same place for up to ten days.

Dr. Fallico also found defensive wounds on Shangin's body, specifically noting that Shangin's broken fingernails showed signs of a struggle. He testified that a hair caught in one of the broken fingernails could be evidence of another person who was present at Shangin's death. Dr. Fallico explained that when a person is strangled, there is a strong

instinct to grasp at the person doing the strangling.

The police collected evidence from the crime scene and from Shangin's body. Various hairs found on Shangin's body were tested. Testing by the state crime lab found the hair from her broken fingernail was microscopically consistent with Shangin's, as were hairs from Shangin's shoulder. Another hair found on Shangin's shoulder was tested for DNA, and Hinson could not be excluded as the source of that hair.

Vaginal swabs of Shangin's body contained sperm components with DNA from two men. Hinson could not be excluded as the source of the major component of the sperm. The source of the minor component was not identified.

The police interviewed Hinson several times over the course of the next two years. Hinson changed his story repeatedly over the course of the interviews, and he identified other people who may have been responsible for Shangin's death.

During his first interview with police, Hinson said that he had been drinking with Shangin and a group of friends about ten days before her body was discovered. During a subsequent interview, he stated that he last saw Shangin about a month before her body was found.

Hinson also admitted that he had a sexual relationship with Shangin. At first, he claimed that he had sex with her about a month before she disappeared, across the highway from where she was found. Later, he stated that he had sex with her the last time he saw her, about ten days to two weeks before her body was found. Eventually, he stated that he had sex with Shangin about a week before her body was found.

During the interviews, the detectives asked Hinson whether he knew about Shangin's dead body. At first, Hinson claimed that he had heard rumors that there was a dead body, but did not know whose it was. Later, Hinson told the police that he told Shangin's son that Shangin's body had been found. Eventually, Hinson admitted that he discovered Shangin's body three or four days after he had sex with Shangin. Hinson stated that Shangin's body was stiff and he did not call the police because he was afraid he would become a suspect.

During the interviews, Hinson speculated as to who killed Shangin. He identified a person he described as Shangin's boyfriend. He later claimed that a man by the name of Darryl or "D.J." may have murdered Shangin. Hinson said that when he was drinking with his friends, he heard Shangin's scream in the distance. Hinson claimed that D.J. then came out of the woods with a solemn look on his face and that D.J.'s hands "looked weird."

Hinson eventually stated that on the night that Shangin went missing, he had sex with her near the area where her body was found. Hinson said that he left Shangin a few minutes after they had sex. He said that when he left, Shangin was lying naked on the ground, silent, and not moving except for heavy breathing. Hinson told detectives he felt something was wrong when he left Shangin. He returned days later to check on her, only to find her dead.

The grand jury indicted Hinson on charges of first- and second-degree murder and manslaughter.[2]

After the State presented its case, Hinson moved for a judgment of acquittal. Hinson argued that when a case is based on circumstantial evidence, the evidence must be of sufficient weight to exclude every reasonable hypothesis that the defendant is innocent. Hinson maintained that there was no direct evidence linking him to the homicide, no evidence that he had a motive to kill Shangin, and that the State had failed to exclude every other reasonable hypothesis. Superior Court Judge Stephanie E. Joannides took the motion under advisement and allowed the trial to proceed.

The jury acquitted Hinson of first-degree murder but convicted him of second-degree murder. Hinson renewed his motion for judgment of acquittal after the jury verdicts, and Judge Joannides later issued a written decision denying his motion.

**2.** AS 11.41.100(a)(1)(A), AS 11.41.110(a)(2), and AS 11.41.120(a)(1), respectively.

Judge Joannides found three statutory aggravating factors from AS 12.55.155:(c)(2) (Hinson's conduct during the commission of the offense manifested deliberate cruelty to another person); (c)(8) (Hinson's criminal history includes conduct involving aggravated or repeated instances of assaultive behavior); and (c)(10) (Hinson's conduct was among the most serious within the definition of the offense). Judge Joannides also found that Hinson was a worst offender. The judge sentenced Hinson to 99 years' imprisonment with 29 years suspended and imposed a 40–year parole restriction.

*Sufficient evidence supported Hinson's conviction*

■ When we review the denial of a motion for judgment of acquittal, we view the evidence presented at trial and the reasonable inferences from that evidence in the light most favorable to the jury's verdict.[3] The evidence is sufficient if a "fair-minded juror exercising reasonable judgment could conclude that the State had met its burden of proving [the defendant's] guilt beyond a reasonable doubt." [4]

■ Hinson argues that no fair-minded juror exercising reasonable judgment could have concluded that the State had met its burden of proof. He maintains that the case was weak and built exclusively on circumstantial evidence. But as Hinson acknowledges, Alaska law does not distinguish between a case built on direct evidence and a case built on circumstantial evidence.[5]

In each of his successive statements to investigators, Hinson admitted to being incrementally closer to Shangin's body and being with her closer to the time of her death. Hinson argues that his initial hesitance to reveal the truth arose from his concern that he would become a suspect. He argues that this fear of becoming a suspect led him to lie to the police about having sex with Shangin the last time he saw her alive. However, as the State points out, the jury could, and did,

infer that Hinson was lying to protect himself from being accused of Shangin's murder.

Hinson also argues that the superior court erroneously found it significant that Hinson's DNA was found in the "major component" of sperm taken from Shangin. Hinson points out that there was a second, minor component of sperm found that belonged to another unidentified man, and argues that the trial court made the inference that because Hinson was identified as the source of the major component, it was most likely that he had sexual relations with Shangin after the other man. Hinson contends that this is an incorrect inference as the forensics expert at trial stated that there was no correlation between major/minor component sperm and the ordering in which it was deposited. Hinson notes that the minor component of sperm could not be identified, even though police tested Shangin's acquaintances and boyfriend. Hinson contends that this creates a strong inference that sex with the unidentified man may not have been consensual and it was a stranger who was the cause of Shangin's death. But the superior court did not make that inference. In fact, when Hinson was arguing the motion during trial, the court recognized that no specific testimony linked the condition of the DNA to the time of Shangin's death.

The State points out that Kevin Peterson, an acquaintance of Shangin's, saw Hinson with Shangin on July 28, 2000, the day Shangin disappeared. Peterson testified that Shangin told him that she and Hinson were going to the liquor store and then to the "trails" (the location where Shangin was found) to drink.

Shangin was last seen on July 28, 2000, with Hinson, and was found 9 days later on August 6, 2000. The DNA evidence established that Hinson had sex with Shangin. And Hinson's statements placed him at the scene of Shangin's death. This, coupled with Peterson's testimony that he last saw Shangin with Hinson on the day she disappeared,

---

**3.** *See Dailey v. State,* 65 P.3d 891, 898 (Alaska App.2003).

**4.** *Id.* at 898.

**5.** *Stern v. State,* 827 P.2d 442, 447 (Alaska App. 1992).

could lead the jury to find that Hinson was the last person with Shangin before she died.

Hinson also argues that the trial court's characterization that the hair evidence was of particular significance is incorrect. The superior court reasoned that because two of the three hairs found on Shangin's bruised right shoulder exhibited the same microscopic features as Hinson's, it would support the theory that he saw her very close to the time of her death "because it would have been unlikely that if he had had sex with her a number of days before that the hair would have remained on her bruised right shoulder."

Hinson asserts that this is not a reasonable inference to make based on the hair evidence. Hinson asserts that the hair evidence actually tends to support his claim of innocence. He notes that, even though one of the hairs found on Shangin's shoulder matched his, two other hairs on her shoulder—hairs that still had their roots attached—did not match his hair. These two hairs were consistent with Shangin's own hair.

Hinson argues that the hair with the roots attached was most likely forcibly removed from the head of Shangin's attacker during a struggle, and the hair without its root (the hair that matched Hinson's hair) likely fell onto Shangin's body when Hinson purportedly discovered the body a day or two after he had sex with her. But as the State points out, a reasonable juror could infer that the hair fell from Hinson while he was strangling Shangin. More importantly, an inference could be made that it was unlikely that Shangin moved after the hair fell on her, which would support the State's theory that Shangin was strangled by Hinson while they had sex and that Shangin never got up after Hinson left her.

Hinson also argues that the hair evidence is more exculpatory than inculpatory. He notes that the rooted hairs—especially the hair found wedged in Shangin's fingernail—were not DNA tested. Hinson argues that the State's assertion that these hairs belonged to Shangin was based on a less-reliable microscopic comparison.

Hinson argues that the State never conducted any DNA tests on those hairs and did not try to match the DNA sperm sample to any of the DNA from them. Hinson asserts that DNA testing done by the defense suggested that the hair in the fingernail did not belong to the victim.

While the defense expert stated that the hair had surface DNA from a female, he also explained that he did not know where the DNA came from. He stated that it could have come from the hair shaft, from blood or saliva, or another bodily fluid that had contact with the hair. Therefore, the jury could infer based on the State's expert that the hair found in Shangin's fingernail was microscopically consistent with Shangin's hair, and that the DNA found on the surface of the hair could have been transferred when Shangin came in contact with another person.

Hinson argues that there was insufficient evidence to convict him based on the inconclusive nature of the forensic evidence and the "largely exculpatory nature" of Hinson's statements to the police. But, taking the facts in the light most favorable to the jury's verdict, the jury could have made reasonable inferences from the evidence admitted at trial and found that Hinson was guilty of murder beyond a reasonable doubt. Accordingly, we conclude that sufficient evidence supported Hinson's conviction.

*Hinson's sentence is not excessive*

During sentencing, Judge Joannides reviewed Hinson's criminal history. Hinson was convicted in 1986 for first-degree burglary and fourth-degree theft. That court initially suspended imposition of sentence, but later imposed sentence when Hinson was convicted in 1987 on two counts of second-degree theft. Hinson also had a 1992 conviction for shoplifting and a 1995 conviction for larceny. The judge noted that Hinson was convicted for misdemeanor assault in 1994 and 1995, and that he also had a 1998 conviction for indecent exposure. She also found Hinson had committed two uncharged incidents of indecent exposure in June and July of 2000. In addition, the presentence report indicates a conviction in 1994 for driving with his license revoked.

Judge Joannides found that all efforts at rehabilitating Hinson had been unsuccessful. The presentence report indicates that Hinson did not perform well on probation supervision. During the time Hinson was on probation for felonies, he failed to appear on numerous occasions for urinalysis and absconded from supervision. As a result of these violations, Hinson's parole was revoked. Judge Joannides said that she was concerned with Hinson's prospects for rehabilitation, noting that Hinson had been released to a halfway house which "is a very structured setting where he was allowed to go into the community and ... come back, or he was able to walk away, and in fact, [Hinson] did." During one time that Hinson absconded, he was charged and convicted for shoplifting cigarettes.

Judge Joannides also noted Hinson's history of alcohol abuse, his almost non-existent work history, and his lack of familial support. Judge Joannides found that isolation was the primary concern in Hinson's case and community condemnation and rehabilitation were secondary.

Judge Joannides found that several statutory aggravating factors from AS 12.55.155 applied in Hinson's case: (c)(2) (Hinson's conduct during the commission of the offense manifested deliberate cruelty to another person); (c)(8) (Hinson's criminal history includes conduct involving aggravated and repeated instances of assaultive behavior); and (c)(10) (Hinson's conduct was among the most serious within the definition of the offense). Hinson challenges Judge Joannides's finding that (c)(2) and (c)(10) were applicable.

■ We have some doubt that the (c)(2) finding is supported by the record. We analyzed the (c)(2) aggravating factor in *Juneby v. State* [6]:

> The word cruelty ... denotes the infliction of pain or suffering for its own sake, or for

the gratification derived therefrom. We think that, in accordance with this common definition, the term "deliberate cruelty," as used in AS 12.55.155(c)(2) must be restricted to instances in which pain—whether physical, psychological, or emotional—is inflicted gratuitously or as an end in itself. Conversely, when the infliction of pain or injury is merely a direct means to accomplish the crime charged, the test for establishing the aggravating factor of deliberate cruelty will not be met.[7]

Although it is reasonable to conclude that Shangin experienced pain when she was strangled, we find little evidence in the record that Hinson inflicted that pain as an end in itself or gratuitously as opposed to inflicting the pain as a consequence of his conduct in committing extreme indifference second-degree murder. But second-degree murder is an unclassified felony to which presumptive sentencing does not apply; aggravating factors apply only by analogy.[8] Therefore, the issue of whether the trial court properly found aggravating factors is moot.

Judge Joannides also found that Hinson was a worst offender based on his prior criminal history, his substance abuse, his failure to benefit from past probation, and the facts of Shangin's murder.

Judge Joannides compared Hinson's crime to the second-degree murder in *Faulkenberry v. State*.[9] Faulkenberry set fire to an apartment, leaving a woman that was passed out on the couch to die.[10] At the time of the murder, Faulkenberry was nineteen years old and had no prior adult criminal history.[11] He did have severe emotional and behavioral problems and had been adjudicated as a delinquent when he was a child.[12] Faulkenberry abused drugs and alcohol at an early age and continued until the time of his arrest.[13] The superior court found that Faulkenberry's conduct involved a reckless and dispassionate disregard for the victim's life and

**6.** 641 P.2d 823 (Alaska App.1982).

**7.** *Id.* at 840.

**8.** *See Gregory v. State,* 689 P.2d 508, 509 (Alaska App.1984).

**9.** 649 P.2d 951 (Alaska App.1982).

**10.** *Id.* at 952–53.

**11.** *Id.* at 953.

**12.** *Id.*

**13.** *Id.*

safety.[14] Even though the superior court classified Faulkenberry as a worst offender, we ruled that that classification did not require the superior court to impose the maximum sentence.[15] We therefore upheld the 60–year term imposed.[16]

Judge Joannides found that Hinson's crime showed a reckless or callous disregard for Shangin's life. She based this finding partly on the statements Hinson made that he left Shangin alone in the woods and in a vulnerable condition while she was having trouble breathing. Judge Joannides decided that a sentence greater than Faulkenberry's 60–year term was appropriate because Hinson was an older offender with an extensive criminal record, and Hinson made no effort at substance abuse treatment.

From our review of the sentencing record, we conclude that Hinson's 70–year term to serve is not clearly mistaken.[17]

Judge Joannides also imposed a 40–year restriction on Hinson's eligibility for discretionary parole. In *Stern v. State*,[18] we held that a sentencing judge exercising the authority conferred by AS 12.55.115 to restrict a defendant's eligibility for discretionary parole must "specifically address the issue of parole restriction [and must set] forth with particularity his or her reasons for concluding that the [normal] parole eligibility prescribed by AS 33.16.090 and AS 33.16.100(c)-(d) is insufficient to protect the public and [e]nsure the defendant's reformation." [19] Hinson would normally be eligible for discretionary parole after serving one third of his 70–year term. The superior court did not explain why the normal parole restriction was inadequate to protect the public or ensure Hinson's rehabilitation. Accordingly, we must vacate that restriction.

Next, we address Hinson's contention that Judge Joannides should have deleted several references to uncharged incidents of indecent exposure that occurred in Juneau in 1993 and 1994 from the presentence report. Hinson objects to allegations by A.L., Hinson's ex-girlfriend, that A.L.'s mother saw Hinson masturbating in front of A.L.'s apartment window. A.L. also alleged that a friend had seen Hinson exposing himself to others in the neighborhood. Hinson claims that because he denied those incidents under oath, the State could not rely on hearsay to prove that the incidents occurred.

In *Charliaga v. State*,[20] we held that at sentencing, the State can rely on hearsay allegations of a defendant's misconduct, unless the defendant takes the stand, denies the allegations, and submits to cross-examination regarding the matter.[21] If the defendant does testify and deny the allegation, the State must support the allegation with testimony or prove that the hearsay declarant is not available to testify before the sentencing court can rely on the allegation.[22] The State must also furnish information supporting the hearsay declarant's credibility.[23]

Here, when Hinson testified, he did not deny the incidents of indecent exposure reported by A.L. Contrary to what he claims in his brief, Hinson expressly chose not to testify about the uncharged acts of indecent exposure. The trial attorney told the court that Hinson made a strategic decision not to address any indecent exposure charges.

Absent Hinson's testimonial denial, Judge Joannides was authorized to rely on "verified" information supporting these allegations. Verified information includes information that is "corroborated or substantiated

14. *Id.* at 955.

15. *Id.* at 956; *see also State v. Wortham*, 537 P.2d 1117, 1120–21 (Alaska 1975).

16. *Faulkenberry*, 649 P.2d at 957.

17. *See McClain v. State*, 519 P.2d 811, 813–14 (Alaska 1974) (an appellate court is to uphold a sentencing decision unless the sentence is clearly mistaken).

18. 827 P.2d 442 (Alaska App.1992).

19. *Id.* at 450.

20. 157 P.3d 1053 (Alaska App.2007).

21. *Id.* at 1054.

22. *Id.*

23. *Id.*

by supporting data or information." [24] In *Nukapigak v. State*, the sentencing judge relied on a presentence report that included statements from friends, relatives, and village members where the defendant lived. [25] On appeal, the supreme court explained that a sentencing judge may rely on these statements, even though they were hearsay, and in some instances, hearsay within hearsay, because the evidence appeared to be trustworthy. [26] The court explained that the identity of the people giving statements were made known to Nukapigak and his attorney, and that they had the opportunity to examine them regarding the basis for their statements and to contradict, explain, or rebut their assertions. In the absence of an indication that the information might have been inaccurate, the sentencing judge was entitled to consider it if the information appeared trustworthy. [27]

In this case, A.L. testified that Hinson exposed himself to A.L.'s mother. A.L.'s report about this incident was made available to Hinson, and the identity of A.L.'s mother was also known to Hinson. Because Hinson did not testimonially deny the uncharged acts of indecent exposure, and the testimony of A.L. regarding the uncharged incidents of indecent exposure was supported by information from both A.L. and in police reports, this information was properly included in the presentence report.

Finally, we address Hinson's challenge to the probation condition that requires Hinson to arrange all contact with his children through their mother, A.L., until the dependents reach eighteen years of age. The State requested that Judge Joannides limit contact between Hinson and his children unless it was arranged through their mother based on an allegation that Hinson had sexually abused one of his daughters. Judge Joannides found that the allegations were unsubstantiated but imposed a probation condition that Hinson arrange contact with his children through A.L. since she was the primary custodian of the children and Hinson would be incarcerated.

A sentencing court has broad authority to fashion conditions of probation so long as the conditions are reasonably related to the probationer's rehabilitation or the protection of the public. [28] Hinson asserts that the probation condition regulating Hinson's access to his dependents is not reasonably related to his rehabilitation and violates his constitutional rights of privacy, liberty, and freedom of association.

The State argues that such a restriction was justified and points to the fact that Judge Joannides found that Hinson had exposed himself to women on more than one occasion.

A person's right to the care and custody of their own child is a fundamental right recognized by both the federal and state constitutions. [29] The right is one of the most basic civil liberties and "clearly falls within the protections of the [D]ue [P]rocess [C]lause and should be accorded significant weight." [30] Probation conditions that restrict constitutional rights are subject to special scrutiny.

As this Court stated in *Thomas v. State*:

A sentencing judge has broad authority to fashion special conditions of probation. However, conditions of probation must be "reasonably related to the rehabilitation of the offender and the protection of the public and . . . not unduly restrictive of liberty." Conditions which restrict constitutional rights are subject to special scrutiny to determine whether the restriction

---

**24.** *Nukapigak v. State*, 562 P.2d 697, 701 n. 2 (Alaska 1977), *aff'd on reh'g*, 576 P.2d 982 (Alaska 1978).

**25.** *Nukapigak*, 576 P.2d at 983.

**26.** *Id.*

**27.** *Id.*

**28.** *Thomas v. State*, 710 P.2d 1017, 1019 (Alaska App.1985); *see also Edison v. State*, 709 P.2d 510, 511 (Alaska App.1985).

**29.** *Seth D. v. State Dept. of Health and Soc. Servs., Office of Children Servs.*, 175 P.3d 1222, 1227 (Alaska 2008).

**30.** *Id.* at 1227–28.

serves the goals of rehabilitation of the offender and protection of the public.[31]

In this case, it does not appear that the condition of probation limiting Hinson's contact with his children through their custodial parent was reasonably related to Hinson's rehabilitation or the protection of the public. Hinson was convicted of murdering Shangin, and it is not clear how regulating his contact with his children will protect the public or ensure Hinson's rehabilitation. The practical reality is that Hinson will be in custody long after his children turn eighteen, and any contact Hinson may have with them will require their mother's cooperation. By the time Hinson is eligible for release on parole or probation, his children will be adults.

Because the record does not support a conclusion that the probation condition protects the public or ensures Hinson's rehabilitation, we direct the superior court to vacate the condition.

*Conclusion*

We AFFIRM Hinson's conviction and 70–year term to serve. We VACATE the 40–year parole restriction and the probation condition regulating Hinson's contact with his dependents.

---

31. *Thomas,* 710 P.2d at 1019 (quoting *Roman v. State,* 570 P.2d 1235, 1240 (Alaska 1977)) (citing *Edison,* 709 P.2d at 511).