Lonnie **FAULKENBERRY**, Appellant,

v.

**STATE** of Alaska, Appellee.

**STATE** of Alaska, Appellant,

v.

Lonnie **FAULKENBERRY**, Appellee.

Nos. 6234, 6235.

Court of Appeals of Alaska.

Aug. 20, 1982.

John Hagey, Asst. Public Defender, Fairbanks, and Dana Fabe, Public Defender, Anchorage, for appellant/cross-appellee.

James P. Doogan, Jr., Asst. Dist. Atty., Harry L. Davis, Dist. Atty., Fairbanks, and Wilson L. Condon, Atty. Gen., Juneau, for appellee/cross-appellant.

Before BRYNER, C. J., and COATS and SINGLETON, JJ.

## OPINION

BRYNER, Chief Judge.

On May 18, 1981, Lonnie Faulkenberry entered pleas of *nolo contendere* to an indictment charging him with arson in the first degree [1] and murder in the second degree (felony murder).[2] Superior Court Judge Gerald Van Hoomissen sentenced Faulkenberry on July 15, 1981, requiring him to serve a term of sixty years' incarceration for the murder charge.[3] From this sentence, Faulkenberry appealed, contending that the sixty-year term of imprisonment is too severe. The state filed a cross-appeal, arguing that Faulkenberry should have received a sentence of ninety-nine years, the maximum term permitted by law.[4] A description of the offense involved in this case, as well as a review of Faulkenberry's background, will be of assistance in clarifying our disposition of these competing appeals.

During January and February of 1981, Lonnie Faulkenberry was a private in the United States Army; he was temporarily

---

1. AS 11.46.400(a) provides:
   A person commits the crime of arson in the first degree if he intentionally damages any property by starting a fire or causing an explosion and by that act recklessly places another person in danger of serious physical injury.

2. AS 11.41.110 provides in relevant part:
   *Murder in the second degree.* (a) A person commits the crime of murder in the second degree if
   . . . .
   (3) acting either alone or with one or more persons, he commits or attempts to commit arson in the first degree, ... and, in the course of or in furtherance of that crime, or

   in immediate flight from that crime, any person causes the death of a person other than one of the participants.

3. At the request of the state, the sentencing court refrained from imposing a sentence on Faulkenberry's plea to the arson charge in order to avoid potential double jeopardy problems.

4. Pursuant to AS 11.41.110(b), murder in the second degree is an unclassified felony; as such it is punishable under AS 12.55.125(b) by "a definite term of imprisonment of at least five years but not more than ninety-nine years."

stationed at Ft. Wainwright, near Fairbanks, so that his company could participate in winter field exercises. On the evening of January 24, 1981, Faulkenberry and a number of other soldiers were permitted to come into Fairbanks on leave. Faulkenberry met Ms. Myra Smith in a downtown bar, and during the course of the evening they both consumed a large amount of liquor. Apparently, Ms. Smith was substantially more intoxicated than Faulkenberry. Shortly after midnight, Faulkenberry and Ms. Smith took a cab from downtown Fairbanks to Smith's apartment, which was located nearby. After their arrival, Ms. Smith lay down on a sofa-bed in the living room. She soon passed out.

After Ms. Smith passed out, Faulkenberry walked into the bedroom area of the apartment and rummaged through the contents of Ms. Smith's closet. He then poured lighter fluid onto the closet floor from a can that he carried in his pocket. He lit the fluid with a match. He also used the lighter fluid to set fire to a bed located in the bedroom. Faulkenberry lingered in the bedroom for a short time, watching the flames grow to a height of about three feet. He then returned to the living room and attempted to wake up Ms. Smith by shaking the sofa-bed upon which she lay. Smith did not awaken. Thereafter, Faulkenberry exited the apartment, taking with him several cassette tapes that belonged to Ms. Smith; apparently he left the apartment door ajar. Faulkenberry walked back to the downtown area, had several drinks with other soldiers, and returned to Ft. Wainwright.[5]

The blaze started by Faulkenberry was reported to authorities by a cab driver passing by Ms. Smith's apartment building. When fire fighters arrived at the scene, the fire was well advanced into the apartment. Ms. Smith was found unconscious on the living room floor, near the entrance to the bedroom; she was badly burned and in critical condition. Ms. Smith was transported to a Fairbanks hospital for emergency treatment, but died soon after arrival. The medical cause of her death was reported as asphyxia by carbon monoxide, coupled with acute pulmonary and cerebral edema.

On February 3, 1981, Fairbanks police officers questioned Faulkenberry about the fire in Ms. Smith's apartment. Although he initially denied any involvement in the crime, Faulkenberry ultimately confessed. His indictment, plea, and sentencing followed.

At the time of his offense, Faulkenberry was nineteen years old, had completed schooling through the eleventh grade, and had served in the army for about one year. He had achieved the rank of E-2.

Although Faulkenberry had no prior adult criminal record, he had long manifested severe emotional and behavioral problems and had been adjudicated a delinquent as a child. At an early age, Faulkenberry began a pattern of drug and alcohol abuse that continued to the time of his arrest. In addition to alcohol, drugs used by Faulkenberry at various times included marijuana, LSD, codeine, valium, amphetamines and seconal. The primary area of Faulkenber-

5. The statement of events transpiring in Ms. Smith's apartment is based primarily upon a confession made by Faulkenberry and recorded by Fairbanks police officers; a transcribed copy of the confession was presented to Judge Van Hoomissen at the time of sentencing. However, these facts are to some extent contested by the state. At the time of sentencing, the state attempted to establish that Faulkenberry intentionally killed Ms. Smith. The state called a witness who testified that, following the fire, Faulkenberry sold the cassette tapes stolen from Ms. Smith to a group of soldiers. According to the state's witness, Faulkenberry bragged about starting the fire to the purchasers of the tapes and specifically said that he would have used lighter fluid directly on Ms. Smith if he had not run out. The state's witness further testified that the inference from Faulkenberry's statements was that Ms. Smith was lying down on the bed that Faulkenberry set on fire, and not on a separate bed. The witness further stated that none of the soldiers who heard Faulkenberry's story took it seriously at the time. In imposing sentence, Judge Van Hoomissen expressly rejected the version of the crime related by the state's witness, finding it to be inconsistent with physical evidence found at the scene. Thus, it appears that the sentencing judge placed greater reliance on the facts as stated by Faulkenberry in his confession.

ry's drug abuse, at least before he entered the army, involved inhaling the vapors from paint and glue. In August, 1977, and October, 1978, Faulkenberry was adjudicated in his home state of Oklahoma as a child in need of supervision based on incidents involving paint and glue sniffing; he considered himself to be addicted at that time.

In his early elementary school years, Faulkenberry also began to display a proclivity for setting fires. On November 9, 1977, Faulkenberry was found to be a delinquent, based on a charge of second-degree arson. One year later, at the insistence of his mother, Faulkenberry turned himself in to Oklahoma authorities in an effort to seek assistance and treatment for his problems. Although he was found to be a child in need of supervision as a result of his paint and glue sniffing activities, there is a substantial indication that Faulkenberry's propensity for setting fires was the major concern. At the time, Faulkenberry's mother expressed her belief that, unless her son received treatment, he might "burn the town down." After he was found to be a child in need of supervision in October, 1978, Faulkenberry was placed in Oklahoma's Lloyd B. Rader Children's Diagnostic Evaluation Center and, later, in the Tecumseh Oklahoma Central Juvenile Treatment Center.

According to Faulkenberry's statements to the police, he had previously started twenty to thirty fires. While these prior incidents primarily involved property such as abandoned vehicles and unoccupied structures, they also included a fire set in a garage located adjacent to an occupied home and a fire in a restaurant that was occupied at the time Faulkenberry set it on fire.

Faulkenberry's history of drug abuse and his tendency to set fires appear to be indicative of profound emotional and psychological problems. Faulkenberry was initially subjected to a psychological evaluation after his delinquency adjudication for arson in 1977. That evaluation concluded that Faulkenberry had a passive-aggressive personality, with a strong possibility of paranoid ideation and low insight into his problems. The evaluation expressed caution about the prospect of releasing Faulkenberry from an institutional setting, noting that he "showed signs of being potentially dangerous to society."

More extensive psychological testing and evaluation were conducted in 1978, when Faulkenberry was found, for the second time, to be a child in need of supervision as a result of his paint and glue sniffing activities. The 1978 evaluation tended to confirm the prior diagnosis of a passive-aggressive personality [6] and emphasized that Faulkenberry's emotional and behavioral problems were substantial and deeply rooted. As with the earlier evaluation, the 1978 report indicated that he was a potential danger to himself and society, and the report expressed skepticism about the chance for successful treatment of Faulkenberry's problems. In addition to information concerning Faulkenberry's 1977 and 1978 psychological evaluations, the sentencing court in this case had before it a letter from a Fairbanks psychiatrist who had examined Faulkenberry after his arrest and concluded that he suffered from the emotional disorder of pyromania. In his letter, the psychiatrist did not address other possible psychological problems, but recommended that the court order a more extensive evaluation of Faulkenberry to be conducted after Faulkenberry was sentenced.[7]

---

**6.** In this respect, the 1978 evaluation stated, in part:

> Lonnie [Faulkenberry] is attempting to overcompensate for feelings of profound inadequacy. He sees the outside world as threatening to him, and responds with angry, aggressive feelings which could quickly manifest themselves in behavior with relatively small provocation.

**7.** It is uncertain whether Dr. Irwin Rothrock, the psychiatrist who examined Faulkenberry after his arrest, had access to the 1977 and 1978 evaluations conducted in Oklahoma. Dr. Rothrock appears to have been under the incorrect impression that Faulkenberry's prior evaluations and treatment involved only his paint and glue sniffing problem. The 1978 Oklahoma evaluation makes it clear, however, that examining psychologists and Oklahoma juvenile offi-

At the sentencing hearing, the state argued that the evidence supported a finding that Faulkenberry intentionally killed Ms. Smith. Thus, the state urged that Faulkenberry be considered a worst offender and that he be sentenced to a maximum term of ninety-nine years' imprisonment.[8] Defense counsel, on the other hand, argued that Faulkenberry could not be considered a worst offender because of his age, his lack of prior violent crimes, and his prior efforts to seek treatment for his problems. Thus, Faulkenberry's counsel requested that a sentence of forty to forty-five years be imposed.

In imposing sentence, Judge Van Hoomissen rejected the argument that Faulkenberry had killed Ms. Smith intentionally and with premeditation. Instead, the judge characterized Faulkenberry's conduct as involving reckless and dispassionate disregard for Ms. Smith's life and safety. However, Judge Van Hoomissen stated that in the context of this case he could not attribute great significance to the difference between intentional and reckless conduct. The judge thus accepted the state's characterization of Faulkenberry's conduct as coming within the worst offender category.

Judge Van Hoomissen stressed the danger posed to the community by Faulkenberry, and he expressed skepticism as to whether Faulkenberry could successfully be rehabilitated, even with extensive psychotherapy. Nevertheless, the judge did take into consideration the fact that, as a juvenile, Faulkenberry had affirmatively sought to obtain psychiatric therapy and that, despite his efforts, he had never been given the chance to participate in an intensive course of psychiatric treatment. Apparently on this basis, Judge Van Hoomissen concluded that, although isolation of Faulkenberry from the community would have to be given priority over rehabilitation, the impo-

sition of a maximum sentence was inappropriate. The judge imposed a sentence of sixty years, with appropriate recommendations for long-term psychiatric, drug and alcohol therapy.

■ We must evaluate the separate appeals brought by the state and by Faulkenberry in light of the totality of this background. The sentence imposed by the superior court must be affirmed unless we conclude, upon an independent review of the record, that the court was clearly mistaken in its sentencing decision.[9] We will first consider the state's contention that Judge Van Hoomissen's sentence was too lenient.

■ The state predicates its claim that Faulkenberry should have received a maximum term of ninety-nine years on the argument that the crime in this case was shown to be intentional and premeditated. The state maintains that, for this reason, Faulkenberry was required to be sentenced to the maximum, as a worst offender. We find little merit to this argument.

Although there was sufficient evidence before the sentencing court to support a finding that Faulkenberry acted intentionally in killing Ms. Smith, there was also substantial evidence to the contrary. Faulkenberry's own confession indicates that his interest and intent at the time of the offense were exclusively focused on setting a fire in Ms. Smith's apartment. There was expert evidence presented establishing that Faulkenberry suffered from pyromania. This evidence, coupled with Faulkenberry's long history of pyromania, would support an inference that he had little control over his compulsion to set fires. There was, additionally, expert testimony that pyromaniacs typically set fires without specific motives or objectives beyond the psychological gratification that they receive from starting and observing the fires which they set.

cers were aware of Faulkenberry's problems with pyromania.

8. The state's recommendation was consistent with the recommendation made to the court in Faulkenberry's presentence report.

9. The clearly mistaken standard of review is applied to sentence appeals brought by the state, on the grounds of leniency, as well as to appeals brought by individual defendants, on the grounds of severity. *See, e.g., State v. Afcan,* 583 P.2d 849 (Alaska 1978); *McClain v. State,* 519 P.2d 811 (Alaska 1974).

Given this record, we cannot say that Judge Van Hoomissen was clearly mistaken in concluding that Faulkenberry was motivated by a compulsion to start a fire in Ms. Smith's apartment and not by a desire to kill Ms. Smith. Nor do we think the judge was mistaken in characterizing Faulkenberry's state of mind toward Ms. Smith as one of callous and reckless disregard for life, rather than one of specific intent to kill. Accordingly, we reject the state's contention that Judge Van Hoomissen erred in failing to conclude that Faulkenberry's conduct was intentional and premeditated.

Judge Van Hoomissen did characterize Faulkenberry as among the worst offenders for the type of crime charged, despite the finding that there was no specific intent to kill. The state separately maintains that the court was obligated to sentence Faulkenberry to the maximum term because of his worst offender status. We reject this argument as well. The fact that a person is determined to be a worst offender in a particular case does not automatically require imposition of a maximum sentence.[10] In this case, the sixty-year term imposed by Judge Van Hoomissen constitutes a substantial and severe sentence, though it does not reach the maximum of ninety-nine years. Given Faulkenberry's age, his lack of an adult criminal record or prior violent misconduct, and his unsuccessful prior efforts to obtain psychiatric assistance, Judge Van Hoomissen was entitled to temper the emphasis that he placed on isolation of the defendant from the community as a sentencing goal by according some weight to the goal of rehabilitation and providing for a sentence that was somewhat less than the maximum provided for by law. We conclude that Faulkenberry's sentence was not too lenient.

■ We next consider Faulkenberry's appeal and his contention that Judge Van Hoomissen imposed a sentence that was too severe. Faulkenberry argues that the sixty-year sentence is unduly harsh when considered in light of his youth, his lack of a prior adult criminal record or of violent behavior, and his willingness to seek treatment for his psychological problems. To bolster this claim, Faulkenberry asserts that the trial court neglected to consider that his conduct resulted from a treatable mental disorder. Furthermore, he contends that a sixty-year term is actually more severe than terms of life imprisonment imposed prior to 1980, under Alaska's former criminal code.

We do not find Faulkenberry's argument to be persuasive. We have consistently deemed crimes of violence to constitute the most serious category of offenses. *See, e.g., Houston v. State,* 648 P.2d 1024 (Alaska App., 1982); *Davis v. State,* 635 P.2d 481 (Alaska App.1981). Worst offenders within a given category of crime may properly be subjected to a maximum, or near-maximum, sentence.[11] It is well settled that worst offender status may be based on an offender's prior criminal background,[12] the seriousness of the offender's conduct in committing the offense charged,[13] or both.[14] In determining whether designation as a worst offender is applicable, the extent to which the offender demonstrates dangerous propensities or an antisocial nature has invariably been a significant consideration.[15]

---

**10.** See *State v. Wortham,* 537 P.2d 1117, 1120–21 (Alaska 1975) (even though defendant's background would justify the conclusion that he was a worst offender, trial court's failure to impose a maximum sentence was not error). *Cf. Notaro v. State,* 608 P.2d 769, 770 (Alaska 1980) (affirming a fifteen-year sentence for manslaughter based on worst offender classification, when, under former AS 11.15.040, maximum sentence provided for the offense was twenty years).

**11.** *State v. Wortham,* 537 P.2d at 1119–20; *Waters v. State,* 483 P.2d 199, 201–02 (Alaska 1971).

**12.** *State v. Wortham,* 537 P.2d at 1120.

**13.** *See, e.g., Hoover v. State,* 641 P.2d 1263, 1264 (Alaska App.1982); *Notaro v. State,* 608 P.2d 769, 770 (Alaska 1980).

**14.** *See, e.g., Tuckfield v. State,* 621 P.2d 1350, 1353 (Alaska 1981).

**15.** *See, e.g., Evans v. State,* 645 P.2d 155 (Alaska 1982); *Tuckfield v. State,* 621 P.2d at 1352–53 (Alaska 1981); *Ahwinona v. State,* 598 P.2d 73, 75–77 (Alaska 1979); *Nukapigak v. State,* 645 P.2d 215 (Alaska App.1982); *Nelson v. State,* 619 P.2d 480, 481 (Alaska App.1980).

In this case, we agree with Judge Van Hoomissen that the record clearly establishes Faulkenberry to be a highly dangerous offender. The manner in which this offense was committed, Faulkenberry's prior history of drug abuse and his long-standing compulsion to set fires, and the deep-seated psychological problems that he has experienced all support this conclusion. Contrary to Faulkenberry's assertion on appeal, the record before us does not reveal that he suffers from an emotional or psychological disorder that is readily amenable to treatment and control through therapy. Rather, psychological evaluations presented to the sentencing court and expert testimony heard at the sentencing hearing justify the sentencing court's conclusion that, even with long-term, intensive psychotherapy, the prognosis for Faulkenberry would be guarded, at best. Given these circumstances, we believe that Judge Van Hoomissen properly relied upon the potential danger that Faulkenberry poses in emphasizing the sentencing goal of isolating him from the community. *See Notaro v. State*, 608 P.2d at 770; *Ahwinona v. State*, 598 P.2d at 75–77; and *Nelson v. State*, 619 P.2d at 481.

Our comment in *Nelson v. State* seems particularly relevant to the overall circumstances of this case. There, in upholding a life sentence for murder in the second degree, we stated:

> The circumstances of the murder in this particular case indicate that Nelson is either severely mentally disturbed or is extremely callous towards the rights and dignity of other human beings. In either event, it seems clear that Mr. Nelson is a danger to the public, and the reality is that the prospect for his rehabilitation is not good.

619 P.2d at 481.[16]

We believe that Faulkenberry's conduct in this case was particularly egregious and could properly be viewed as being among the worst conduct constituting second-degree murder. Since Faulkenberry could properly be classified as a worst offender based on the manner in which his offense was committed, the sentencing court would not have been clearly mistaken had it imposed a maximum sentence. It follows that Judge Van Hoomissen's decision to impose a term of years less than the maximum cannot be deemed too severe.

The sentence imposed by the superior court is AFFIRMED.

---

**16.** *See also Evans v. State*, 645 P.2d at 163. In *Evans*, the supreme court upheld a thirty-year sentence for conviction of second-degree murder under Alaska's former criminal code. In so doing, the court stated:

> Evans has demonstrated that he is a serious threat to society. In cases such as these, especially given a history of similar incidents, isolation of the offender and community condemnation must, as the superior court noted, be significant concerns in sentencing.

In this case, Faulkenberry has argued that his sixty-year term is more severe than a life sentence under the former criminal code. We believe that this argument is unpersuasive. The argument is predicated entirely on the faulty premise that persons sentenced to life imprisonment under the old code will be released soon after they initially become eligible for parole. It disregards the possibility that such individuals may never be granted discretionary parole and may be forced to serve the balance of their natural lives in prison. Moreover, Faulkenberry's argument, to the extent that it points out the potential for a discrepancy between treatment of offenders under the old code and similar offenders under the new code, simply demonstrates that the legislators who drafted and enacted the Revised Alaska Criminal Code chose to provide for more severe penalties for individuals who are convicted of murder.