**Shay J. BOZIEL, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–4730.**

Court of Appeals of Alaska.

Dec. 10, 1993.

**554**

Barbara Brink, Asst. Public Defender, Kodiak, and John B. Salemi, Public Defender, Anchorage, for appellant.

Robert J. Collins, Asst. Dist. Atty., Edward E. McNally, Dist. Atty., Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

### OPINION

BRYNER, Chief Judge.

Shay J. Boziel was charged with murder in the first degree and eventually entered into an agreement with the state to plead no contest to the lesser offense of murder in the second degree. The agreement called for Boziel to receive a sentence of no more than thirty years. Superior Court Judge John Reese accepted the terms of the negotiated disposition and sentenced Boziel to thirty years. Boziel appeals, contending that his sentence is excessive. We affirm.

### THE OFFENSE

In the early morning hours of April 22, 1990, Boziel and a companion, Edward G. Vogler, were drinking, socializing, and driving around Anchorage. Boziel was carrying a .22 caliber handgun he had obtained from a girlfriend. Earlier that night, while speaking with his girlfriend, Boziel had asked how she felt about shooting someone.

As the two men drove, they spotted a female pedestrian, a stranger. Vogler stopped the car. Boziel offered the pedestrian, D.M., a ride. She accepted. As D.M. approached the car, Boziel told Vogler he intended to shoot her. Within minutes, Boziel fired three shots into D.M.'s chest at point blank range, without warning or provocation. After the shooting, Boziel and Vogler left D.M.'s body in an alley garbage crib. Vogler partially disrobed D.M.'s body to make the homicide look like it had been sexually motivated.

A short time after Boziel and Vogler abandoned D.M.'s body, a police officer attempted to stop their car for an equipment violation. Vogler led the officer on a high speed chase but was eventually stopped. The police arrested him for driving while intoxicated. They arrested Boziel on outstanding traffic warrants.

Within several hours, while both men remained in custody, D.M.'s body was discovered, and the police were summoned. Fortuitously, the officer who had earlier stopped Boziel and Vogler responded to the call and connected the two men to the killing. The police questioned Vogler; he told them that Boziel actually fired the shots. Physical evidence tended to corroborate his story. Vogler negotiated an agreement to plead no contest to manslaughter in return for his testimony against Boziel. Because of uncertainty as to whether a jury would accept Vogler's testimony against Boziel, the state agreed to allow Boziel to plead no contest to second-degree murder; the agreement included the thirty-year sentencing cap.

### THE OFFENDER

Boziel was nineteen years old when he committed the murder. He had recently received a general discharge from the Army for unsatisfactory performance. Boziel spent his early life in California, where he grew up in a troubled and unstable family environment. Boziel was introduced to alcohol and other drugs at an early age;

by the time of this offense, he had developed a serious alcohol and drug abuse problem.

Between the ages of twelve and sixteen, Boziel accumulated a significant record of delinquent behavior in California, which culminated in his adjudication in 1986 for conduct amounting to felony theft. Most of Boziel's juvenile misconduct involved property offenses; his 1986 felony adjudication involved theft of a firearm. In addition, at fourteen years of age he had been accused of sexually molesting a child; the charge had resulted in a deferred prosecution agreement.

Boziel's delinquency subsided abruptly in the latter part of 1986, when he and his foster parents moved from California to Kentucky. By all accounts, Boziel's behavior improved dramatically; his academic performance stabilized, he pursued a course of vocational training with outstanding results, and he successfully completed his juvenile probation.

Boziel's improved behavior lasted until he enlisted in the Army after his eighteenth birthday. The improvement appears to have resulted from his placement in a stable and nurturing family setting. Upon joining the Army, however, Boziel again experienced significant problems. His discharge from the Army, which occurred only slightly more than a year after enlistment, resulted from a consistent pattern of insubordination and noncompliant behavior.

Boziel's current offense occurred approximately a month after he left the Army. After being charged with murder, Boziel was placed in the Cook Inlet Pretrial Facility; he resided there until his sentencing hearing, two and one-half years later. Boziel's institutional record at Cook Inlet was poor: he spent approximately half of his pre-sentence incarceration in punitive detention for recurring infractions involving failed or refused drug screens and possession of unauthorized articles.

Prior to sentencing, Boziel submitted to a psychological evaluation by Dr. James F. Harper. Harper found that Boziel suffered from polysubstance abuse and chronic depression. In addition, he found that Boziel met the diagnostic criteria for antisocial personality disorder. Harper noted several traits—including a capacity for empathy—indicating that Boziel was not "entirely sociopathic" in his "total personality structure." These traits caused Harper to question whether Boziel's conduct could properly be characterized as a "thrill killing." Harper nevertheless found the diagnosis of antisocial personality disorder generally appropriate, stating:

> Mr. Boziel does have poor behavioral controls, is impulsive, lacks long-term goals, is unstable in his unemployment, abuses drugs, and has a history of juvenile delinquency. He has clearly not been able to manage his feelings [or] his behavior adequately since incarceration.

## THE SENTENCING HEARING

At his sentencing hearing, Boziel argued that as a youthful first offender who had shown himself capable of exemplary conduct when placed in a stable environment, he deserved a sentence recognizing his prospects for rehabilitation—a sentence that included a substantial amount of suspended time. Boziel urged Judge Reese to impose a term of thirty years with ten years suspended. That sentence would place him at the low end of the benchmark sentencing range for second-degree murder. *Page v. State*, 657 P.2d 850, 855 (Alaska App.1983). This is where Boziel contended he belonged.

Judge Reese flatly rejected Boziel's proposal. Finding that the nature of Boziel's crime and the manner in which he committed it were extraordinarily aggravated, Judge Reese expressed the view that, but for the sentencing agreement, Boziel's conduct would easily have warranted a sentence exceeding the thirty-year benchmark range. Judge Reese assessed Boziel's conduct as follows:

> This is a murder case. Mr. Boziel picked up [D.M.]. Shortly thereafter, shot her 3 times. She was killed suddenly, without warning, without reason. Completely innocent, and apparently completely unaware that it was about to

happen. She may not have even known it happened. She's dead. This was senseless, it's random, the presentence report referred to it as a thrill killing, and the defense has responded to that. I don't know that that has any technical meaning, I suppose it's as good a term as any. It's certainly the way it sounds to me. And now this young woman is gone, ... her body was found in an alley, dumped in the trash.

Given the circumstances of the offense, Judge Reese found the thirty-year maximum the parties had agreed on to be lenient, concluding that "[i]t's justified only because of the [state's] proof problems."

Before imposing Boziel's sentence, Judge Reese expressly considered rehabilitation but concluded that Boziel's prospects for rehabilitation were not favorable:

> I considered that Mr. Boziel is unlikely to respond well to efforts at rehabilitation. He has drug problems, he has a history of family problems, he has many things like that. Some of those can be solved, they can be solved by him, they don't necessarily respond to outside efforts.

Judge Reese also expressly considered and rejected as unwarranted Boziel's request to suspend a substantial portion of the sentence. In reaching this decision, the judge acknowledged that Boziel had shown himself capable of controlling his behavior under certain circumstances:

> [Defense counsel] has argued that the 30 year sentence with 10 years suspended would be appropriate, because that would give 10 years for a probation office to supervise Mr. Boziel and give him support[.] [Counsel] points out that he did well when he had a foster family that loved him and that accepted him and that supported him. And he did do well briefly while he had that kind of acceptance. Probationary supervision, however, is not regarded as proof of affection, which is really what Mr. Boziel responded to, I think. It's part of the restrictive process, and restrictions and rules are what Mr. Boziel does not handle well. I would expect Mr. Boziel to fail on probation.

Judge Reese went on to observe that the senselessness of Boziel's crime caused serious concern for public safety: "It's profoundly frightening to think that somebody can pick up a perfect stranger and kill them for no reason, ... right in our midst." Given Boziel's history of misconduct, his poor prospects for rehabilitation, and the seriousness of his crime, the judge concluded that Boziel deserved a sentence emphasizing deterrence, community condemnation, and isolation.

For these reasons, Judge Reese imposed the maximum term allowed under the plea agreement, thirty years.

## DISCUSSION

On appeal, Boziel insists that Judge Reese's decision to impose the maximum sentence permitted by the plea agreement reflects a "complete failure to consider rehabilitation as a [sentencing] goal." As demonstrated in the passages quoted above, however, Judge Reese gave careful consideration to the goal of rehabilitation and to the advisability of suspending a portion of Boziel's term. His consideration simply led him to a conclusion other than the one Boziel wanted.

Judge Reese was under no obligation to give rehabilitation top priority in sentencing. The judge's skepticism toward Boziel's prospects for rehabilitation and toward the likelihood of his success on probation was well justified by the record.

Boziel also argues that his thirty-year term is excessive in comparison to sentences received by other offenders convicted of second-degree murder. He likens himself to other offenders convicted of second-degree murder for whom sentences of twenty years or less have been approved. Relying on Dr. Harper's report, Boziel disputes Judge Reese's characterization of his crime as a "thrill killing." Boziel challenges the judge's conclusion that the seriousness of his conduct would justify a sentence exceeding the negotiated thirty-year limit.

In advancing this argument, however, Boziel views the record in the light most

favorable to himself, ignoring the somewhat dimmer view taken by Judge Reese, a view the record fully supports. Boziel also attempts to ameliorate his situation by pointing to evidence indicating that Vogler was not truthful in naming Boziel as the person who fired the murder weapon. Boziel suggests that Vogler himself may have committed the crime. Boziel thus complains of a lack of "parity," since Vogler pled no contest to a lesser crime and received a more lenient sentence.

■ But Boziel's comparison of his situation to Vogler's is inapposite precisely because it asserts the possibility that Vogler was the person who shot D.M. To be sure, as Judge Reese recognized in his sentencing remarks, Boziel was entitled to take full advantage of any weakness or uncertainty in the state's evidence to negotiate a favorable disposition of his first-degree murder charge. Beyond the favorable plea and sentence limit he negotiated, however, Boziel retained no right to receive a sentence discounted for uncertainty. By entering his plea of no contest to second-degree murder, Boziel necessarily consented to have his commission of the crime be taken as established fact. Judge Reese did just that, accepting Boziel's plea at face value. The judge was justified in doing so.

■ Apart from questions concerning the strength of the state's case against Boziel, the record permits little uncertainty as to the magnitude of the crime committed in this case. That crime was a deliberate, unprovoked, and apparently purposeless killing of a randomly selected victim. It matters little whether we call Boziel's crime a "thrill killing" or something else; the unique seriousness of the crime inheres in the unfathomable sources of motivation from which it arose. That Boziel committed a murder for unknown and profoundly unknowable reasons adds a frightening element of unpredictability to his case—an element that engenders grave doubt as to his capacity for reform and provides strong reason to think that he will pose a serious, continuing threat to society. *Cf. Nelson v. State*, 619 P.2d 480, 481 (Alaska App.1980).

In cases of second-degree murder involving gratuitous and inexplicable acts of homicide we have consistently upheld sentences substantially exceeding thirty years' imprisonment. *See, e.g., Ridgely v. State*, 739 P.2d 1299, 1302 (Alaska App.1987); *Faulkenberry v. State*, 649 P.2d 951, 956–57 (Alaska App.1982). Having independently reviewed the entire sentencing record, we conclude that the sentence imposed below is not clearly mistaken. *McClain v. State*, 519 P.2d 811, 813–14 (Alaska 1974).

The sentence is AFFIRMED.