**James D. BROWN, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–6439.**

Court of Appeals of Alaska.

Feb. 19, 1999.

**16.** *Id.* at 202.

Ronald A. Offret, Aglietti & Offret, Anchorage, for Appellant.

Nancy R. Simel, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

MANNHEIMER, Judge.

James D. Brown stands convicted of second-degree murder. Superior Court Judge John E. Reese sentenced Brown to serve 55 years in prison, a sentence considerably more severe than the 20– to 30–year benchmark range established by this court in *Page v. State*.[1]

In our prior decision in this case[2], we vacated Brown's sentence and directed the superior court either to impose a sentence within the *Page* benchmark range or else explain why Brown's sentence should exceed the benchmark range to this degree. Judge Reese reconsidered Brown's sentence and again imposed a 55–year prison term.

Brown now renews his sentence appeal; he contends that his 55–year sentence is excessive. For the reasons explained here, we agree with Brown and we therefore reverse his sentence.

### Underlying Facts

Brown was a cocaine dealer. On February 7, 1995, Brown went to the home of his longtime friend, Jas Dixson, to collect the money that Dixson owed for some cocaine that Brown's associate had previously delivered to Dixson. Dixson offered Brown approximately $2000 for the cocaine. This was apparently less than the agreed-upon price, but Dix-

1. 657 P.2d 850, 855 (Alaska App.1983).

2. *See Brown v. State,* Memorandum Opinion No. 3815, 1998 WL 224920 (Alaska App.; May 6, 1998).

son claimed that the delivery had been "short" (that is, Dixson claimed that he had not received the full weight of cocaine). Brown offered to make good the difference, but Dixson declined.

At some point during this discussion, Dixson produced a handgun and placed it on the counter beside him. Brown grabbed the gun and aimed it at Dixson. About this time, Dixson's wife came downstairs and saw what was happening. When she interposed herself between the two men, Brown raised the gun over her shoulder. At this point, the weapon discharged; the bullet struck Dixson in the head and killed him. While Dixson's wife called 911, Brown fled the residence.

Brown was indicted for first-degree murder, but the authorities could not find him. Brown eventually surrendered himself several months later. At trial, Brown asserted that he had grabbed the weapon from the counter to protect himself. He contended that he had not meant to shoot Dixson—that the gun went off accidently when Dixson's wife came between the two men and jostled or struck Brown. A superior court jury acquitted Brown of first-degree murder but found him guilty of second-degree murder.

Brown was 24 years old when he committed this murder. He had no prior criminal record.

*Judge Reese's Initial Sentencing Analysis*

At Brown's first sentencing, the State argued that Brown's offense was aggravated by two of the factors listed in AS 12.55.155(c): (c)(4)—that Brown used a dangerous instrument in the commission of the offense; and (c)(10)—that Brown's offense was among the most serious second-degree murders. Judge Reese recognized that aggravating factor AS 12.55.155(c)(4) applied to Brown's case because Brown committed the homicide by means of a firearm. However, the judge concluded that this aggravating factor should not affect Brown's sentence, since second-degree murders are generally committed by the use of dangerous instruments. Regarding the second proposed aggravator, Judge Reese rejected the notion that Brown's offense was among the most serious second-degree murders. The judge concluded that

the "really serious second-degree murder[s]" reflected in past reported cases were "well beyond the nature of [Brown's] case".

Having rejected the State's contention that Brown's crime was aggravated under AS 12.55.155(c), Judge Reese then gave his own view of the offense:

> Here we have friends of some duration who were apparently involved in drug sales, with substantial [amounts of] money changing hands.... There was discussion about being short on the drug deal.... I [don't] think it takes a great deal of imagination to conclude that [this] was ... a tension-producing discussion. People don't talk about drugs that way, people don't trade wads of money that way, people don't refuse to turn cocaine over without there being tension generated.
>
> [These] people knew each other, but this was a business discussion. This was an unpleasant business discussion—because business wasn't working smoothly, people weren't doing what they were supposed to do.... This is the setting in which the events began.

Judge Reese initially declined to resolve the question of how Brown had obtained the handgun. The judge merely noted that "[h]owever he got it—whether he brought it [to Dixson's house, or] whether Mr. Dixson pulled it out of the drawer and slapped it onto the counter—Mr. Brown ended up with the gun." But then Judge Reese proceeded to analyze Brown's culpability under the assumption that the victim, Dixson, was the one who produced the handgun:

> [Brown] grabbed [the gun], ... he grabbed it on purpose, intentionally, at a time after Jas Dixson had put it down on the counter, at a time when Jas Dixson was sitting down. Mr. Brown intentionally grabbed the gun to grab control of the situation[.] ... [A]nd then Jennelle Dixson came in and wrested control of the situation from everybody else. Mr. Brown ... was pointing the gun intentionally [and] the gun went off, possibly or even probably because Jennelle Dixson inserted herself into the controversy.... Maybe it wasn't Mr. Brown['s] intention to shoot the

gun at that moment, maybe it wasn't his intention to ever shoot the gun, but he intentionally took the gun, he intentionally pointed the gun, he intentionally put ... his finger on the trigger and created a situation that was very, very likely to cause someone's death. And someone died.

This is not a worst case; this is not a first-degree murder case. Nor was this an innocent accident, or an accident mitigated by a lot of circumstances. This death was a predictable [result] of using a firearm to gain control in a discussion. A man is dead, [and] two families are permanently devastated as a result of it.

Judge Reese then addressed the sentencing goals codified in AS 12.55.005. The judge concluded that Brown's sentence should not emphasize rehabilitation because Brown "persist[ed] ... [in blaming Jennelle Dixson and] in denying the magnitude of his conduct". The judge also concluded that Brown's sentence should not emphasize deterrence: he noted that Brown had acted impulsively, and he expressed the opinion that impulsive crimes of violence could not really be deterred.

Judge Reese concluded that the main sentencing goals in Brown's case should be isolation of the offender and reaffirmation of societal norms. The judge reached this conclusion because Brown had involved himself in the drug trade and had used a firearm to enforce his rights in a drug sale. These acts, Judge Reese declared, proved that Brown was "a dangerous man".

Judge Reese recognized that Brown's prior history was "fairly good". Even so, Judge Reese concluded that Brown should receive a sentence of 55 years' imprisonment.

### Judge Reese's Analysis on Remand

As explained above, we vacated Brown's sentence in our earlier decision and we directed Judge Reese either to sentence Brown within the *Page* benchmark range (20 to 30 years to serve) or else to explain more fully why Brown should receive a sentence sub-

stantially more severe than this benchmark. Upon reconsideration, Judge Reese decided to re-impose the 55–year sentence. The judge found that Brown was "not a typical second-degree murder defendant":

> This murder occurred as part of the enforcement of financial responsibility in a cocaine enterprise. Mr. Brown supports himself by the sale of cocaine. [At trial, he] lied to the jury and the court about [his source of income,] and [he] did not accept responsibility for the murder. When released, he seems likely to re[-]enter the [drug] business, and to again represent a threat to the lives of others in the community. Isolation is [thus] very important.

Judge Reese expressed his view that the *Page* benchmark was "dicta" and that it therefore did not govern his sentencing decision. However, the judge also found that Brown's offense was "sufficiently extraordinary to justify departure from the *Page* benchmark":

> James Brown committed second[-]degree murder as part of a commercial drug sale collection confrontation, [an event] which is likely to recur if he isn't off the street.... His [55–year] sentence is 8 years beyond the midpoint sentence authorized by the legislature. He would be released in as few as 10 years if given a 30[-]year sentence. He is too dangerous to be released so soon....

### The Page Benchmark

■ The ultimate question presented here is whether the superior court was clearly mistaken when it sentenced Brown to serve 55 years for this second-degree murder.[3] Our decision in *Page v. State* is the starting point for analyzing Brown's sentence.

■ In *Page*, this court reviewed past second-degree murder sentences and established a benchmark sentencing range for this offense. We concluded that "[a person] convicted of [second-degree murder] should

---

3. *See McClain v. State*, 519 P.2d 811, 813–14 (Alaska 1974) (holding that sentencing decisions are to be affirmed on appeal unless they are "clearly mistaken").

[typically] receive a sentence of from twenty to thirty years [to serve]".[4]

When Judge Reese explained his renewed decision to sentence Brown to serve 55 years, he characterized the *Page* benchmark as *dictum*. Judge Reese pointed out that Page himself received 99 years to serve, a sentence which this court affirmed. From this, Judge Reese concluded that any language in *Page* about a 20- to 30-year benchmark sentencing range was unnecessary to this court's decision.

Whatever one might conclude from reading *Page* in isolation, this court's later sentencing decisions make it clear that the *Page* benchmark range governs sentencing in second-degree murder cases.[5] Indeed, our prior decision in Brown's case was specifically premised on the vitality and applicability of the *Page* benchmark range. We vacated Brown's sentence and directed the superior court to reconsider the sentence precisely because Judge Reese failed to explain his "departure from the *Page* benchmark".[6]

■ As is evident from the result in *Page* itself (where this court affirmed a 99-year sentence for second-degree murder), a benchmark sentencing range does not create fixed sentencing boundaries. Rather, a benchmark range is designed to "provide assistance and guidance to sentencing [judges] faced with difficult sentencing decisions" by furnishing a numerical "starting point[ ] for individualized [sentencing] analysis in each case".[7]

Benchmarks are intended to help courts avoid unjustified disparity in sentencing by forcing judges to articulate reasons for imposing atypical sentences. When a sentencing judge "decides that an offender deserves a sentence which is significantly different from sentences previously given to similarly situated offenders", the judge is required to "find some legitimate basis for the difference"—that is, a basis related to the sentencing criteria originally announced in *State v. Chaney*[8] and now codified in AS 12.55.005.[9] The benchmark

> promote[s] careful consideration of whether actual differences exist between [the] case [before the court] and prior, generally similar cases, and encourage[s] [sentencing] courts to [clarify] their reliance on those differences when they do exist.

*Williams*, 809 P.2d at 934. And, because sentencing judges are required to articulate their reasons for imposing sentences above or below the benchmark, the benchmark fosters another goal: better-informed appellate review of sentencing decisions.

■ A typical offender who commits a typical offense should receive a sentence within the benchmark range. Mitigating circumstances can justify a sentence below the benchmark range, while aggravating circumstances can justify a sentence above the benchmark range.[10] There are few legal restrictions on the types of factors that a sentencing court can consider when assessing whether a particular sentence should fall outside the benchmark range. As we stressed in *Williams*, "any sound reason may be relied on to differentiate one case from another."[11] But the benchmark does serve as an anchor: a sentencing judge must have sound reasons before imposing a sentence that varies from the benchmark.

### Our Analysis of Brown's Sentence

■ Brown's 55-year sentence is a substantial upward departure from the 20- to

---

4. *Page*, 657 P.2d at 855.

5. *See*, for example, *Cheely v. State*, 861 P.2d 1168, 1179 (Alaska App.1993); *Norris v. State*, 857 P.2d 349, 356, 357 (Alaska App.1993); *Gustafson v. State*, 854 P.2d 751, 763 (Alaska App. 1993); *Sam v. State*, 842 P.2d 596, 603 (Alaska App.1992); *Ross v. State*, 808 P.2d 290, 291 (Alaska App.1991); *Odom v. State*, 798 P.2d 353, 356 (Alaska App.1990).

6. *Brown v. State*, Memorandum Opinion No. 3815, 1998 WL 224920 (Alaska App.; May 6, 1998), slip opinion at 15.

7. *Williams v. State*, 809 P.2d 931, 933 (Alaska App.1991).

8. 477 P.2d 441, 443–44 (Alaska 1970).

9. *Williams*, 809 P.2d at 935.

10. *See Page*, 657 P.2d at 855.

11. 809 P.2d at 934.

30–year benchmark range established in *Page.* As explained above, the superior court offered various reasons why Brown's conduct should be categorized as atypically serious. But having examined the record, we conclude that these reasons are unconvincing.

As noted above, Brown was a young offender with no prior criminal (or juvenile) record. After the homicide, he hid from the authorities, but he eventually turned himself in voluntarily.

Judge Reese sentenced Brown under the assumptions that (1) Jas Dixson was the one who produced the handgun and placed it on the counter, and (2) Brown had not intended to shoot Dixson. Judge Reese found, nevertheless, that Brown acted culpably because he took up the weapon, put his finger to the trigger, and pointed the gun at Dixson. Even though Judge Reese found that the weapon was fired accidentally, Judge Reese concluded that the homicide was aggravated because (1) Brown was a drug dealer and (2) Brown had used a firearm to gain control in a dispute over a drug sale.

If Judge Reese had found that Brown was a drug dealer who generally used firearms to intimidate his clients and enforce drug contracts, then we would uphold Judge Reese's conclusion that Brown's offense constituted an aggravated instance of second-degree murder. But Judge Reese found the opposite. When he sentenced Brown, Judge Reese assumed that the gun belonged to Dixson and that it was Dixson who produced the gun and placed it on the counter, apparently for the purpose of intimidating Brown or otherwise gaining control of the situation. Thus (under Judge Reese's view of the case), even though Brown came to Dixson's house to obtain payment for a drug transaction, Brown did not initiate the use of force or the threat of force. Although Brown subsequently grabbed Dixson's gun to gain control of the situation, Brown was responding to Dixson's act; it was Dixson who first introduced an element of deadly force into the discussion.

Judge Reese also concluded that there was little hope for Brown's rehabilitation. He reached this conclusion based on his findings that Brown was a drug dealer, that Brown had lied under oath about his sources of income, and that Brown persisted in minimizing his responsibility for the homicide by blaming Jennelle Dixson for what had happened.

Judge Reese's third finding is problematic—his finding that Brown was trying to minimize his responsibility for the homicide by blaming Jennelle Dixson. To the extent that Brown blamed Jennelle Dixson for what happened, this conclusion is supported by Judge Reese's own findings at sentencing. We note, in particular, Judge Reese's findings that "Jennelle Dixson came in and wrested control of the situation from everyone else" and that "the gun went off, . . . probably because Jennelle Dixson inserted herself into the controversy".

The record supports Judge Reese's first two findings—that Brown was a drug dealer and that Brown committed perjury at trial when asked to describe his sources of income. Thus, there is some support for Judge Reese's conclusion that Brown was likely to return to drug dealing upon his release from prison. However, under the facts of this case, Brown's likelihood of returning to the drug trade does not support Judge Reese's conclusion that Brown will pose a continuing danger to the lives of his customers and associates. Under the facts as found by Judge Reese, Brown did not initiate the use of force; rather, he reacted precipitously to a dangerous situation created by Dixson. Moreover, Judge Reese concluded that even after Brown grabbed the handgun and pointed it at Dixson, the homicide probably would not have occurred if Jennelle Dixson had not intervened.

In short, taking Judge Reese's view of the evidence, Brown was a young drug dealer who was unexpectedly confronted with a dangerous situation when Jas Dixson—a customer who was also Brown's long-time friend—pulled a gun during their discussion about an alleged shortage in a previous delivery of cocaine. Brown grabbed the gun and pointed it at Dixson, but he did not intend to shoot Dixson and he probably would not have fired the gun if he had not been distracted or

unnerved by the intervention of Jennelle Dixson.

This is not meant to minimize the seriousness of Brown's conduct. Brown was convicted of second-degree murder because the jury concluded that Brown acted with manifest indifference to the value of human life.[12] As Judge Reese noted, "[a] man is dead, [and] two families are permanently devastated as a result of it." But the question before us is whether Brown's conduct, his background, or a combination of these two factors justifies a substantial departure from the *Page* benchmark sentencing range of 20 to 30 years in prison. This question must be answered by determining whether there is sound reason to conclude, from Brown's conduct and/or his background, that his offense is substantially more serious than a typical second-degree murder.

In cases where death has resulted from gratuitous or otherwise inexplicable acts of extreme violence, we have upheld second-degree murder sentences that substantially exceed the *Page* benchmark range. See, for example, *Page* itself[13], *Faulkenberry v. State*[14], *Norris v. State*[15], *Monroe v. State*[16], and *Gustafson v. State* and *Cheely v. State*[17]. But Brown's conduct can not realistically be likened to the conduct of the defendants in these cases. Given the facts found by Judge Reese, Brown's offense appears to be within

the mainstream of the unintended, extremely reckless homicides defined by AS 11.41.110(a)(2).

For these reasons, we REVERSE Brown's sentence. This case is remanded to the superior court for resentencing. The superior court shall sentence Brown to no more than 30 years to serve.

STEWART, Judge, dissenting in part.

I concur with majority's decision to remand the case to Judge Reese for re-sentencing because, on this record, I agree with the conclusion of the majority that Brown's sentence is clearly mistaken.[1] Judge Reese's findings at sentencing and his supplemental findings on remand do not meet our requirements for a substantial departure from the *Page* benchmark. Having gone that far, my judgment is we need go no farther.

A comparison of Brown's conduct with the conduct of defendants in other reported cases leads to the conclusion that Brown's crime appears within the mainstream of second-degree murders as defined by AS 11.41.110(a)(2). I agree with that part of the majority's analysis. Nevertheless, an individualized sentencing process must also examine the defendant. Perhaps the facts of a defendant's crime may not justify a depar-

12. *See* AS 11.41.110(a)(2).

13. 657 P.2d at 853–55. The defendant in *Page* had a substantial criminal record. *Id.* at 853–54. Page repeatedly stabbed his victim, then tied him up and left him to die. *Id.* at 854. This court upheld the finding that Page was a "worst offender", and we affirmed Page's 99–year sentence. *Id.* at 855.

14. 649 P.2d 951 (Alaska App.1982). The defendant in *Faulkenberry* spent the night drinking with a woman he met in a bar. When they returned to the woman's apartment, the woman passed out on a sofa. Faulkenberry then poured lighter fluid around the apartment, set the fluid on fire, watched until the flames reached a height of three feet, and then left—knowing that the woman was unconscious and likely to die. *Id.* at 953. This court upheld Faulkenberry's 60–year sentence. *Id.* at 956–57.

15. 857 P.2d 349 (Alaska App.1993). The defendant in *Norris* was fighting with his domestic partner. He picked up a rifle, hit her in the head

and knocked her to the floor, then held her down and pointed the rifle at her head. The weapon fired when the victim struggled to escape. *Id.* at 352. We upheld Norris's 50–year sentence. *Id.* at 356–58.

16. 847 P.2d 84 (Alaska App.1993). The defendant in *Monroe* was mentally ill. He killed his father by stabbing him thirty-three times. *Id.* at 85. We upheld Monroe's 60–year sentence. *Id.* at 92–93.

17. 854 P.2d 751 (Alaska App.1993), and 861 P.2d 1168 (Alaska App.1993), respectively. The defendants in *Gustafson* and *Cheely* decided to shoot a motorist who allegedly cut in front of their car on the highway. Gustafson shot the motorist with a rifle after Cheely positioned his car for the shot. *Gustafson*, 854 P.2d at 754. We upheld Gustafson's 65–year sentence, 854 P.2d at 763–67, and Cheely's 60–year sentence, 861 P.2d at 1178–1180.

1. *See McClain v. State*, 519 P.2d 811, 813–14 (Alaska 1974).

ture from *Page*, but the inability to reform a dangerous defendant might.

In some cases discussed by the majority where the defendant's sentence for second-degree murder substantially exceeded the *Page* guideline, we noted the gratuitous and inexplicable nature of the homicides.[2] In our review of the sentence in another irrational homicide, we also reasoned that a defendant's unfathomable conduct can engender "grave doubt as to his capacity for reform and provides strong reason to think that he will pose a serious, continuing threat to society."[3]

Yet it does not necessarily follow that conduct, such as Brown's, that is understandable, though no less reprehensible than conduct that is baffling, means that Brown is less of a threat to society and more likely to reform. I think the more important inquiry, in any case, must be whether the defendant will be a continuing threat to society balanced against the defendant's capacity for reform. Because I do not think that our cases require a deranged or depraved homicide to exceed the *Page* benchmark, I think that a thorough analysis at sentencing that shows that the defendant will continue as a threat to society and that the defendant has little capacity for reform can justify an upward departure from the *Page* benchmark.

Therefore, I dissent from the mandate that Judge Reese conduct Brown's re-sentencing with a thirty-year ceiling. While I agree that Brown's 55-year term is clearly mistaken on the present record, I also conclude that we should not limit the maximum potential sentence to the *Page* benchmark.

2. *See Faulkenberry v. State,* 649 P.2d 951 (Alaska App.1982); *Ridgely v. State,* 739 P.2d 1299 (Alaska App.1987).

3. *Boziel v. State,* 864 P.2d 553, 557 (Alaska App. 1993).